[No. S005910. Sept. 5, 1991.]

MARY M., Plaintiff and Respondent, v.
CITY OF LOS ANGELES, Defendant and Appellant.

**COUNSEL**

James K. Hahn, City Attorney, John T. Neville and Richard M. Helgeson, Assistant City Attorneys, Katherine J. Hamilton and Greg Wolff, Deputy City Attorneys, for Defendant and Appellant.

Slatter & Slatter, Slatter, Slatter & Kiesel, Vann H. Slatter and Roni Keller for Plaintiff and Respondent.

**OPINION**

**KENNARD, J.**—Police officers occupy a unique position of trust in our society. They are responsible for enforcing the law and protecting society from criminal acts. They are given the authority to detain and to arrest and, when necessary, to use deadly force. As visible symbols of that formidable power, an officer is furnished a distinctively marked car, a uniform, a badge, and a gun. Those who challenge an officer's actions do so at their peril; anyone who resists an officer's proper exercise of authority or who obstructs the performance of an officer's duties is subject to criminal prosecution. (Pen. Code, §§ 69, 148.)

When law enforcement officers abuse their authority by committing crimes against members of the community, they violate the public trust. This may seriously damage the relationship between the community and its sworn protectors, by eroding the community's confidence in the integrity of its police force.

The issue in this case is: When a police officer on duty, by misusing his official authority, rapes a woman whom he has detained, can the public entity that employs him be held vicariously liable for his misconduct? We conclude that the employer can be held liable under the doctrine of respondeat superior.

## I. FACTS

About 2:30 a.m. on October 3, 1981, plaintiff Mary M. was driving home alone when Sergeant Leigh Schroyer of the Los Angeles Police Department stopped her for erratic driving. Sergeant Schroyer was on duty as a field supervisor; he was assigned to supervise and train police officers patrolling the streets. He was in uniform, wore a badge and a gun, and was driving a marked black-and-white police car. When he detained plaintiff, he sent in a radio message that he was out of his vehicle conducting an investigation.

Sergeant Schroyer asked plaintiff for her driver's license; plaintiff gave it to him. He then asked her to perform a field sobriety test to determine whether she was under the influence of alcohol. Plaintiff, who had been drinking, did not do well on the test. She began to cry, and pleaded with Schroyer not to take her to jail. Schroyer ordered her to get in the front seat of the police car, but he did not handcuff her. He then drove to plaintiff's home.

After entering the house with plaintiff, Sergeant Schroyer told her that he expected "payment" for taking her home instead of to jail. Plaintiff tried to run away, but Schroyer grabbed her hair and threw her on the couch. When plaintiff screamed, Schroyer put his hand over her mouth and threatened to take her to jail. Plaintiff stopped struggling, and Schroyer raped her. He then left the house.

From his police car, Sergeant Schroyer sent a radio message that he was returning from a "lunch" break. The radio operator questioned this, because Schroyer had previously reported that he was conducting an investigation. Schroyer did not respond to the question, and returned to the police station.

As a result of this incident, criminal charges were filed against Sergeant Schroyer, and a jury convicted him of rape (Pen. Code, § 261, subd. (2)). The trial court sentenced him to state prison.

Plaintiff then brought a civil lawsuit against both Sergeant Schroyer and his employer, the City of Los Angeles (hereafter the City), for damages arising out of the rape. Plaintiff's complaint originally asserted that the City was liable for negligence in employing Schroyer and that, as Schroyer's employer, the City was also vicariously liable under the doctrine of respondeat superior. At trial, however, plaintiff relied solely on the theory of respondeat superior. The jury returned a verdict for plaintiff, finding that "at the time of the events out of which this case arose" Sergeant Schroyer was "acting within the scope of his employment with the Los Angeles Police Department." The jury assessed general damages of $150,000 against the City.[1]

A divided Court of Appeal reversed the judgment against the City. The majority held, as a matter of law, that Sergeant Schroyer was not acting within the scope of his employment when he raped plaintiff. We granted plaintiff's petition for review.

## II. DISCUSSION

### A. *General Principles Underlying Employer's Vicarious Liability*

■ Under the doctrine of respondeat superior, an employer may be held vicariously liable for torts committed by an employee within the scope of employment. (*Perez* v. *Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 967 [227 Cal.Rptr. 106, 719 P.2d 676].) The origins of respondeat superior have been traced to ancient Roman law. (5 Harper et al., The Law of Torts (2d ed. 1986) § 26.2, pp. 8-10; Holmes, *Agency* (1891) 4 Harv.L.Rev. 345; but see Wigmore, *Responsibility for Tortious Acts: Its History* (1894) 7 Harv.L.Rev. 315, 383 [stating the doctrine has Germanic, not Latin, origins].) The doctrine is a departure from the general tort principle that liability is based on fault. (*Rodgers* v. *Kemper Constr. Co.* (1975) 50 Cal.App.3d 608, 618 [124 Cal.Rptr. 143].) It is " 'a rule of policy, a deliberate allocation of a risk.' " (*Hinman* v. *Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 959 [88 Cal.Rptr. 188, 471 P.2d 988]; *Perez* v. *Van Groningen & Sons, Inc., supra*, 41 Cal.3d at p. 967.) Respondeat superior is based on " 'a deeply rooted sentiment' " that it would be unjust for an enterprise to disclaim responsibility for injuries occurring in the course of its characteristic activities. (*Rodgers, supra*, 50 Cal.App.3d 608 at p. 618, quoting *Ira S. Bushey & Sons, Inc.* v. *United States* (2d Cir. 1968) 398 F.2d 167, 171 [per

---

[1]Sergeant Schroyer did not appear to defend the action, either in person or through counsel. Based on the evidence presented to the jury in plaintiff's action against the City, the trial court entered judgment finding Schroyer jointly and severally liable with the City for the jury's $150,000 damage award. In addition, the court imposed punitive damages of $150,000 against Schroyer. Schroyer did not appeal the judgment.

Friendly, J.]; see also *Pacific Mut. Life Ins. Co.* v. *Haslip* (1991) 499 U.S. ___, ___ [113 L.Ed.2d 1, 17, 111 S.Ct. 1032, 1041] [rejecting due process challenge to respondeat superior liability].)

Recently, we articulated three reasons for applying the doctrine of respondeat superior: (1) to prevent recurrence of the tortious conduct; (2) to give greater assurance of compensation for the victim; and (3) to ensure that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury. (*Perez* v. *Van Groningen & Sons, Inc.,* *supra,* 41 Cal.3d at p. 967; 5 Harper et al., *op. cit. supra,* § 26.5, at p. 21.)

■ For the doctrine of respondeat superior to apply, the plaintiff must prove that the employee's tortious conduct was committed within the scope of employment. (*Ducey* v. *Argo Sales Co.* (1979) 25 Cal.3d 707, 721 [159 Cal.Rptr. 835, 602 P.2d 755].) "A risk arises out of the employment when 'in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business. [Citations.] In other words, where the question is one of vicarious liability, the inquiry should be whether the risk was one "that may fairly be regarded as typical of or broadly incidental" to the enterprise undertaken by the employer. [Citation.]' " (*Perez* v. *Van Groningen & Sons, Inc., supra,* 41 Cal.3d at p. 968, citing *Rodgers* v. *Kemper Constr. Co., supra,* 50 Cal.App.3d at p. 619, brackets in original.)

Tortious conduct that violates an employee's official duties or disregards the employer's express orders may nonetheless be within the scope of employment. (*Perez* v. *Van Groningen & Sons, Inc., supra,* 41 Cal.3d at p. 969; *Meyer* v. *Blackman* (1963) 59 Cal.2d 668, 679 [31 Cal.Rptr. 36, 381 P.2d 916]; Van Alstyne, Cal. Government Tort Liability Practice (Cont.Ed.Bar 1980) § 2.22, p. 62.) So may acts that do not benefit the employer (*Perez, supra,* 41 Cal.3d at p. 969), or are willful or malicious in nature (*John R.* v. *Oakland Unified School Dist.* (1989) 48 Cal.3d 438, 447 [256 Cal.Rptr. 766, 769 P.2d 948]; *Martinez* v. *Hagopian* (1986) 182 Cal.App.3d 1223, 1227 [227 Cal.Rptr. 763]).

■ The doctrine of respondeat superior applies to public and private employers alike. As stated in subdivision (a) of Government Code section 815.2 (all further statutory references are to the Government Code): "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." By this language, the Legislature incorporated "general standards of tort liability as the

primary basis for respondeat superior liability of public entities. . . ." (Van Alstyne, *op. cit. supra*, § 2.32, at p. 77.) Courts have construed the term "scope of employment" in section 815.2 as broadly as in private tort litigation. (Van Alstyne, *op. cit. supra*, § 2.32, at p. 79; see generally, *John R. v. Oakland Unified School Dist., supra*, 48 Cal.3d at p. 447.)

B. *California Decisions Discussing Public Employer Liability for Sexually Assaultive Conduct by Police*

When the Court of Appeal decided this case, only one published decision in this state had addressed the issue of whether a law enforcement officer who commits a sexual assault while on duty can be deemed to have acted within the scope of employment. In *White v. County of Orange* (1985) 166 Cal.App.3d 566 [212 Cal.Rptr. 493], a deputy sheriff detained a female motorist late at night, placed her in the back of his patrol car, drove her around for hours in an isolated area, and repeatedly threatened to rape and kill her. When she promised to go out with him that weekend, he returned her to her car. After she drove away, he again stopped her, this time to obtain a "goodnight kiss." Based on this entire incident, the officer was convicted of kidnapping and false imprisonment.

Thereafter, the motorist brought a civil suit against the officer's employer, the County of Orange, on a theory of vicarious liability. The trial court granted the county's motion for summary judgment; the Court of Appeal reversed. The appellate court observed that an officer is entrusted with a substantial degree of authority, and that the motorist submitted to that authority, stopping her car solely because the officer had ordered her to do so. Accordingly, the court held, the officer's wrongful acts "flowed from the very exercise of this authority," and the county could be held liable for the officer's conduct. (*White v. County of Orange, supra*, 166 Cal.App.3d at pp. 571-572.)

Recently, this court had occasion to examine *White* in *John R. v. Oakland Unified School Dist., supra*, 48 Cal.3d 438 (hereafter *John R.*), which involved the application of respondeat superior in a different context. In *John R.*, a junior high school student sued the school district, alleging he had been sexually molested by his teacher while at the teacher's apartment as part of an officially sanctioned, extracurricular program. The trial court ruled that the school district could not be held vicariously liable for the molestation, and granted the district's motion for nonsuit. We upheld the trial court's ruling.

The lead opinion[2] in *John R.* did not consider whether the case was factually similar to other cases in which employers had been held liable for the tortious acts of their employees. Instead, it focused on the rationale underlying the imposition of such liability: to prevent recurrence of the tortious conduct, to give greater assurance of compensation for the victim, and to ensure that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury. (*Perez* v. *Van Groningen & Sons, Inc., supra,* 41 Cal.3d at p. 967.) After evaluating these three factors, the lead opinion in *John R.* concluded that imposition of liability against the teacher's employer was not warranted. (*John R., supra,* 48 Cal.3d at p. 452.) Although the opinion declined to determine whether *White* v. *County of Orange, supra,* 166 Cal.App.3d 566, was correctly decided, it suggested that the policy reasons underlying the doctrine of respondeat superior would justify its application when a police officer uses his authority to enable him to commit a sexual assault. (*John R., supra,* 48 Cal.3d at p. 452.)

The City contends that *White* v. *County of Orange, supra,* 166 Cal.App.3d 566, was wrongly decided, and that a police officer's act of rape, even when preceded by an assertion of authority, is outside the scope of his employment as a matter of law. Before addressing the merits of this contention, we first consider whether the doctrine of invited error precludes the City from asserting it.

## C. *Application of Invited Error Doctrine*

In this case, the trial court instructed the jury, based on *White* v. *County of Orange, supra,* 166 Cal.App.3d 566, that when "a police officer who, as a result of the exercise of his authority, legally causes injury," the employer may be held liable regardless of the employer's rules or knowledge of the wrongful conduct, and regardless of whether the employer or the employee benefited from the act itself.[3] Because the record indicated that the City had requested the instruction, we solicited briefing from the parties to determine whether the doctrine of invited error should bar the City from contending

---

[2]Two of the seven justices signed the lead opinion. Three justices concurred "in the majority's holding" on the question of vicarious liability, and did not express disagreement with the lead opinion's analysis of that issue; they dissented on an unrelated issue. The remaining two justices would have held the school district vicariously liable.

[3]The instruction in full read: "An employer is liable for the wrongful acts of a police officer who, as the result of the exercise of his authority, legally causes injury even though the wrongful acts occurred without the employer's knowledge, were not related to the duties he was employed to perform, were not for the benefit of the employer, were done solely for the personal benefit of the employee, and were done in violations [*sic*] of the employer's rules or grant of authority."

that, as a matter of law, Sergeant Schroyer was acting outside the scope of his employment when he raped plaintiff.

The record shows that the instruction was proposed under the following circumstances. Throughout the proceedings in this matter, the City challenged the decision in *White* v. *County of Orange, supra,* 166 Cal.App.3d 566. The trial court correctly considered itself to be bound by the appellate court's decision in *White.* (See *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) At the instruction conference, the court told the parties that notwithstanding the City's objections, it would instruct the jury in accordance with *White,* and that unless the City proffered an alternative instruction it would give plaintiff's proposed instruction, which was based on *White.* The City then submitted, and the court gave, the instruction quoted above.

Immediately after the case was submitted to the jury, the trial court gave the parties an opportunity to "tie up any loose ends" relating to any matter that had not yet been "put on the record." Counsel for the City then explained the circumstances which led it to submit the instruction at issue: "[D]uring our many, many hours of discussions concerning jury instructions, I did indicate to the court that we did not believe that *White* was an appropriate case with which the jury should be instructed as it was . . . not an appropriate statement of the law. [¶] The court indicated that it would follow *White* and unless I wanted Plaintiff's instructions to be the ones to go to the jury, I would be requested to draft an instruction based upon the language in *White.* [¶] In response to that, the defense submitted an instruction based upon *White* which the court . . . read to the jury. [¶] For the record, I would like it to be clear that we do not believe that *White* is the authority that should be followed and that we objected to giving any instructions in accordance with the *White* case, albeit, we did submit an instruction based upon the court's request." The trial court agreed with counsel's account, but pointed out that the precise wording of the instruction was the City's.

■ Under the doctrine of invited error, when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error. (*People* v. *Perez* (1979) 23 Cal.3d 545, 549-550, fn. 3 [153 Cal.Rptr. 40, 591 P.2d 63]; *Jentick* v. *Pacific Gas & Elec. Co.* (1941) 18 Cal.2d 117 [114 P.2d 343]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 301, p. 313.) But the doctrine does not apply when a party, while making the appropriate objections, acquiesces in a judicial determination. (*People* v. *Perez, supra,* 23 Cal.3d at p. 550, fn. 3.) As this court has explained: " 'An attorney who submits to the authority of an erroneous, adverse ruling after making appropriate objections or motions,

does not waive the error in the ruling by proceeding in accordance therewith and endeavoring to make the best of a bad situation for which he was not responsible.' " (*People* v. *Calio* (1986) 42 Cal.3d 639, 643 [230 Cal.Rptr. 137, 724 P.2d 1162], quoting *Leibman* v. *Curtis* (1955) 138 Cal.App.2d 222, 225 [291 P.2d 542].)

Here, the City did not invite the trial court to instruct the jury that liability for a sexual assault can arise from a police officer's exercise of official authority. To the contrary, it took the opposite position throughout the case, including the instruction conference. The City never *induced* the trial court to follow *White* v. *County of Orange, supra,* 166 Cal.App.3d 566; it merely acquiesced—after objecting—to the court's decision to instruct in accordance with *White,* and submitted an instruction in accordance with that decision.[4] Although the City would be barred from attacking the specific language of the jury instruction it submitted, it is, under the circumstances of this case, not precluded from asserting that *White* v. *County of Orange, supra,* 166 Cal.App.3d 566, was erroneously decided and that, as a matter of law, the evidence presented here established that Sergeant Schroyer acted outside the scope of his employment when he raped plaintiff.[5]

D. *Imposition of Liability in This Case*

■ Ordinarily, the determination whether an employee has acted within the scope of employment presents a question of fact; it becomes a question of law, however, when "the facts are undisputed and no conflicting inferences are possible." (*Perez* v. *Van Groningen & Sons, Inc., supra,* 41 Cal.3d at p. 968.) In some cases, the relationship between an employee's work and wrongful conduct is so attenuated that a jury could not reasonably conclude that the act was within the scope of employment. (See, e.g., *John R., supra,* 48 Cal.3d at p. 1452; *Rita M.* v. *Roman Catholic Archbishop* (1986) 187 Cal.App.3d 1453, 1461 [232 Cal.Rptr. 685]; *Alma W.* v. *Oakland Unified School Dist.* (1981) 123 Cal.App.3d 133, 139-140 [176 Cal.Rptr. 287].) ■ The City contends that such is the case here, asserting that even if all conflicts in the facts and the inferences to be drawn from those facts are

---

[4]Justice Baxter's concurring opinion asserts that, before the case was submitted to the jury, the City should have placed on the record its objections to an instruction that was based on *White* v. *Superior Court, supra,* 166 Cal.App.3d 566. This contention ignores the realities of trial practice. Experienced litigators know that many trial courts conduct unreported instruction conferences and permit counsel to "make their record" by recording their objections after the jury has retired to deliberate. This practice promotes judicial efficiency, because it allows matters to be placed on the record at a time when the jury will not be kept waiting. We see no reason to condemn the procedure used by the trial court in this case.

[5]As the City has made no arguments regarding the precise wording of the instruction, we express no views on its appropriateness.

resolved in plaintiff's favor, Sergeant Schroyer was acting outside the scope of employment when he raped plaintiff.[6]

We do not agree. As we shall explain, Sergeant Schroyer's conduct was not so divorced from his work that, as a matter of law, it was outside the scope of employment. Rather, the question of whether Sergeant Schroyer acted within the scope of his employment was one properly left for the jury to decide.

As we mentioned earlier, the test for determining whether an employee is acting outside the scope of employment is whether " 'in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.' " (*Perez* v. *Van Groningen & Sons, Inc., supra,* 41 Cal.3d at p. 968.) To assist us in that determination, we first consider whether the three policy objectives underlying respondeat superior would be achieved by applying the doctrine when a police officer on duty misuses his official authority and commits an act of rape. The lead opinion in *John R., supra,* 48 Cal.3d 438, concluded that because under the facts of that case application of respondeat superior would not further the doctrine's underlying rationale, it should not be invoked. That is not the case here.

■ The first of the three policy objectives supporting the application of respondeat superior is that imposing liability on the employer may prevent recurrence of the tortious conduct, because it "creates a strong incentive for vigilance by those in a position 'to guard substantially against the evil to be prevented.' " (*Pacific Mut. Life Ins. Co.* v. *Haslip, supra,* 499 U.S. at p. __ [113 L.Ed.2d at p. 17, 111 S.Ct. at p. 1041], quoting an earlier case.) In *John R.,* the lead opinion concluded that this policy did not support the imposition of liability on the school district whose teacher committed sexual misconduct because the preventive measures that the employer could be forced to take would do more harm than good. To impose vicarious liability in that situation, the opinion explained, "would be far too likely to deter districts from encouraging, or even authorizing, extracurricular and/or one-on-one contacts between teachers and students or to induce districts to impose such rigorous controls on activities of this nature that the educational process would be negatively affected." (*John R., supra,* 48 Cal.3d at p. 451.)

By contrast, imposition of liability here would not be likely to cause public entities to take preventive measures that would impair the effectiveness of law enforcement activities. As the lead opinion in *John R.* said: "We

---

[6]Because this is the City's contention, the facts at the outset of this opinion have been stated in the light most favorable to plaintiff.

doubt that police departments would deprive their officers of weapons or preclude them from enforcing the laws . . . ." (*John R.*, *supra*, 48 Cal.3d at p. 452.)

The imposition of liability on public entities whose law enforcement officers commit sexual assaults while on duty would encourage the employers to take preventive measures.[7] There is little or no risk that preventive measures would significantly interfere with the ability of police departments to enforce the law and to protect society from criminal acts. We therefore conclude that the first policy basis for respondeat superior—encouraging the employer to take measures to prevent recurrence of the tortious conduct—supports the jury's verdict against the City in this case.[8]

We now consider the second reason underlying the application of respondeat superior: to give greater assurance of compensation to the victim. The Legislature has recognized that the imposition of vicarious liability on a public employer is an appropriate method to ensure that victims of police misconduct are compensated. It has done so by declining to grant immunity to public entities when their police officers engage in violent conduct. Since the enactment of the California Tort Claims Act in 1963 (§ 810 et seq.), a governmental entity can be held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct. (*City of Los Angeles* v. *Superior Court* (1973) 33 Cal.App.3d 778, 782 [109 Cal.Rptr. 365]; *Larson* v. *City of*

---

[7] We note that the San Francisco Police Department has recently adopted this internal rule: "Whenever a male officer transports a female in a Department vehicle, for whatever reason, he shall notify Dispatch of: [¶] The vehicle's starting mileage. [¶] The location from which he is leaving. [¶] His destination. [¶] Upon arriving at his destination the officer should notify Dispatch that he has arrived and broadcast the vehicle's ending mileage. Dispatch confirms each of the officer's broadcasts." (S.F. Police Dept. Information Bull. No. 90-96, eff. Nov. 21, 1990.) We do not suggest that this policy is essential to deter officers from engaging in sexual misconduct; it merely illustrates the type of measure that a law enforcement agency can take to reduce the incidence of sexual assaults by police officers on duty.

[8] Justice Baxter's concurring opinion objects to the majority opinion for "fail[ing] to explain what additional measures the City could or should practically have taken to prevent [Sergeant Schroyer's] intentional sexual misconduct." (Conc. opn. by Baxter, J., *post*, p. 237.) The concurring opinion also complains that "no matter what the City does, it may be held liable for a police officer's criminal conduct including offenses such as this rape." (Conc. opn. by Baxter, J., *post*, p. 237.) These objections are misplaced, as they are directed at the doctrine of respondeat superior itself, rather than its application to the facts of this case.

Under the doctrine of respondeat superior, the employer is held vicariously liable for tortious conduct of its employees that is within the scope of employment. The employer's liability is unaffected by the steps it has taken to prevent such conduct. How best to prevent similar conduct in the future is a matter left to the employer; the doctrine provides an incentive for the employer to determine the appropriate measures to implement.

The Legislature has determined that the doctrine of respondeat superior should apply to employing governmental entities, as it does to all other employers. It is not the function of this court to question the propriety of the Legislature's decision.

*Oakland* (1971) 17 Cal.App.3d 91, 98 [94 Cal.Rptr. 466]; *Scruggs* v. *Haynes* (1967) 252 Cal.App.2d 256, 268 [60 Cal.Rptr. 355]; *Griffith* v. *City of Monrovia* (1982) 134 Cal.App.3d Supp. 6 [184 Cal.Rptr. 709]; see also *Jones* v. *City of Los Angeles* (1963) 215 Cal.App.2d 155 [30 Cal.Rptr. 124].) The decisions cited have recognized, at least implicitly, that vicarious liability is an appropriate method to ensure that victims of police misconduct are compensated.[9]

The only difference between those cases and the one now before us is that here the assault victim was raped rather than beaten. Surely the victim's need for compensation in this instance is as great as in other cases of violent tortious conduct by a police officer while on duty. Accordingly, the second policy objective of the doctrine of respondeat superior supports the jury's verdict imposing liability on the City.

Finally, the third policy consideration—the appropriateness of spreading the risk of loss among the beneficiaries of the enterprise—also favors the imposition of vicarious liability against the City. Here, too, *John R.* is instructive. The lead opinion recognized that school districts and the community at large benefit from the authority that teachers are given over students, but it concluded that the connection between that authority and a teacher's sexual abuse of a student was "simply too attenuated to deem a sexual assault as falling within the range of risks allocable to a teacher's employer," and thus did not support vicarious liability in that context. (*John R., supra,* 48 Cal.3d at p. 452.) The opinion contrasted the difference in authority, "in both degree and kind," between a teacher and a police officer: "[T]he authority of a police officer over a motorist—bolstered most immediately by his uniform, badge and firearm, and only slightly less so by the prospect of criminal sanctions for disobedience—plainly surpasses that of a teacher over a student." (*Ibid.*)

At the outset, we observed that society has granted police officers extraordinary power and authority over its citizenry. An officer who detains an individual is acting as the official representative of the state, with all of its coercive power. As visible symbols of that power, an officer is given a distinctively marked car, a uniform, a badge, and a gun. As one court commented, "police officers [exercise] the most awesome and dangerous power that a democratic state possesses with respect to its residents—the power to use lawful force to arrest and detain them." (*Policeman's Benev. Ass'n of N.J.* v. *Washington Tp.* (3d Cir. 1988) 850 F.2d 133, 141.) Inherent in

---

[9]Although it has extended immunity to governmental entities in a variety of other circumstances, the Legislature has not granted them immunity from liability for assaults by police officers, sexual or otherwise.

this formidable power is the potential for abuse. The cost resulting from misuse of that power should be borne by the community, because of the substantial benefits that the community derives from the lawful exercise of police power.

As demonstrated, each of the three policy reasons supports the imposition of vicarious liability on the employer of a police officer who, while on duty, commits a sexual assault by misusing his official authority. ▅▅▅ The City nevertheless maintains that a police officer who commits rape while on duty can never be acting within the scope of his employment because the conduct is so unusual that to impose liability on the officer's employer in that instance would be unfair.

The City relies on our decision in *Perez v. Van Groningen & Sons, Inc.*, *supra*, 41 Cal.3d 962. In that case, the defendant employer assigned an employee to drive a tractor through an orchard while pulling a disking attachment. The employee invited his nephew to ride with him. A branch knocked the nephew off the tractor and into the disking attachment. We held that the employee was acting within the scope of his employment, and therefore the employer could be held liable for the employee's negligent acts. We explained: "A risk arises out of the employment when 'in the context of the particular enterprise an employee's conduct is not so *unusual or startling* that it would seem unfair to include the loss resulting from it among other costs of the employer's business. . . . [T]he inquiry should be whether the risk was one "that may *fairly be regarded as typical of or broadly incidental*" to the enterprise undertaken by the employer. [Citation.]' " (*Perez v. Van Groningen & Sons, Inc.*, *supra*, 41 Cal.3d at p. 968, italics added.) Seizing on the italicized language, the City contends that the tortious act— rape—committed by Sergeant Schroyer is so "unusual or startling" that it cannot "fairly be regarded as typical of or broadly incidental" to the task of law enforcement. We disagree.

As noted previously, society has granted police officers great power and control over criminal suspects. Officers may detain such persons at gunpoint, place them in handcuffs, remove them from their residences, order them into police cars and, in some circumstances, may even use deadly force. The law permits police officers to ensure their own safety by frisking persons they have detained, thereby subjecting detainees to a form of nonconsensual touching ordinarily deemed highly offensive in our society. (*Terry v. Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868].) In view of the considerable power and authority that police officers possess, it is neither startling nor unexpected that on occasion an officer will misuse that authority by engaging in assaultive conduct. The precise circumstances of the assault need not be anticipated, so long as the risk is one that is reasonably

foreseeable. Sexual assaults by police officers are fortunately uncommon; nevertheless, the risk of such tortious conduct is broadly incidental to the enterprise of law enforcement, and thus liability for such acts may appropriately be imposed on the employing public entity.[10]

In arguing against such liability, the City relies on *Alma W. v. Oakland Unified School Dist., supra,* 123 Cal.App.3d 133. There, the Court of Appeal upheld a trial court's ruling that a school district could not be held vicariously liable for the sexual molestation of an 11-year-old child by a school custodian on school grounds. As the court observed, "There is no aspect of a janitor's duties that would make sexual assault anything other than highly unusual and very startling." (*Id.* at p. 143.) By contrast, the very nature of law enforcement employment requires exertion of physical control over persons whom an officer has detained or arrested. The authority to use force when necessary in securing compliance with the law is fundamental to a police officer's duties in maintaining the public order. (Nat. Advisory Com. on Crim. Justice Stds. and Goals, Police (1973) p. 18.) That authority carries with it the risk of abuse. The danger that an officer will commit a sexual assault while on duty arises from the considerable authority and control inherent in the responsibilities of an officer in enforcing the law. Those responsibilities do not at all resemble the duties of a school custodian, as involved in *Alma W., supra.*[11]

The City argues that when Sergeant Schroyer raped plaintiff, he was not acting in the course of his employment, but was primarily pursuing his own interests. ■ In *Hinman v. Westinghouse Elec. Co., supra,* 2 Cal.3d at page 960, we said that those cases that have considered recovery against an employer for injuries occurring within the scope and during the period of employment have established a general rule of liability "with a few exceptions" in instances where the employee has "substantially deviated from his duties for personal purposes."

To determine whether a particular set of facts falls into one of those "few exceptions," it is necessary to examine the employees' conduct as a whole,

---

[10]It was established at the trial that the Los Angeles Police Department has a policy, similar to that of the San Francisco Police Department (see fn. 7, *ante*), which requires officers on duty who transport persons of the opposite sex to report the time and the mileage on the vehicle's odometer before and after the trip. The existence of such a policy suggests that the department considers it neither startling nor unexpected that its officers might engage in, or be accused of, sexually assaultive conduct.

[11]We stress that our conclusion in this case flows from the unique authority vested in police officers. Employees who do not have this authority and who commit sexual assaults may be acting outside the scope of their employment as a matter of law. (See, e.g., *Rita M. v. Roman Catholic Archbishop, supra,* 187 Cal.App.3d 1453 [priests who allegedly seduced teenage parishioner acted outside the scope of employment].)

not simply the tortious act itself. (See, e.g., *Carr* v. *Wm. C. Crowell Co.* (1946) 28 Cal.2d 652 [171 P.2d 5] [employee who threw a hammer at another employee after a dispute held to have acted within the scope of employment].) " 'The fact that an employee is not engaged in the ultimate object of his employment at the time of his wrongful act does not preclude attribution of liability to an employer.' " (*John R.*, *supra*, 48 Cal.3d at p. 447, quoting *Alma W.* v. *Oakland Unified School Dist.*, *supra*, 123 Cal.App.3d at p. 139.) As we said in *Perez* v. *Van Groningen & Sons, Inc.*, *supra*, 41 Cal.3d at page 970: "[T]he proper inquiry is not '"whether the wrongful act itself was authorized but whether it was committed in the course of a series of acts of the agent which were authorized by the principal." ' "

Here, Sergeant Schroyer was acting within the scope of his employment when he detained plaintiff for erratic driving, when he ordered her to get out of her car and to perform a field sobriety test, and when he ordered her to get in his police car. Then, misusing his authority as a law enforcement officer, he drove her to her home, where he raped her. When plaintiff attempted to resist Sergeant Schroyer's criminal conduct, he continued to assert his authority by threatening to take her to jail. Viewing the transaction as a whole, it cannot be said that, as a matter of law, Sergeant Schroyer was acting outside the scope of his employment when he raped plaintiff.

The City cites authorities from other jurisdictions in arguing that it should not be held vicariously liable when a police officer in its employ commits a sexual assault while on duty. Those decisions, however, do not support the City's position in this case. In one case cited by the City (*Lyon* v. *Carey* (D.C. Cir. 1976) 533 F.2d 649 [174 App.D.C. 422]), the court upheld a verdict finding an employer liable under the doctrine of respondeat superior. In that case, a delivery man brought a mattress to the plaintiff's home and, following a dispute over the manner of payment for the delivery, physically and sexually assaulted her. Concluding that the jury could have reasonably found that the delivery man's tortious conduct arose out of the delivery dispute, the federal appellate court upheld the jury's verdict imposing liability on the man's employer. (*Id.* at p. 655.)

Other decisions relied on by the City are distinguishable because they involved sexual assaults by private security guards. (*Heindel* v. *Bowery Savings Bank* (1988) 138 A.D.2d 787 [525 N.Y.S.2d 428]; *Webb by Harris* v. *Jewel Companies, Inc.* (1985) 137 Ill.App.3d 1004 [485 N.E.2d 409]; *Rabon* v. *Guardsmark, Inc.* (4th Cir. 1978) 571 F.2d 1277 [diversity case applying South Carolina law].) Because such persons do not act as official representatives of the state, any authority they have is different from, and far less than, that conferred upon an officer of the law. Still other cases relied on by

the City are distinguishable because they involved sexual assaults by police officers who were not on duty when they committed the sexual assaults. (*Bates* v. *Doria* (1986) 150 Ill.App.3d 1025 [502 N.E.2d 454]; *Gambling* v. *Cornish* (N.D.Ill. 1977) 426 F.Supp. 1153.)

By contrast, the facts of *Applewhite* v. *City of Baton Rouge* (La.Ct.App. 1979) 380 So.2d 119 more closely resemble those of this case. There, the City of Baton Rouge was held vicariously liable when one of its police officers detained a teenage girl for vagrancy while she was walking with friends, ordered her into his police car to be taken to jail, then took her to another location where he forced her to engage in acts of sexual intercourse and oral copulation.

In arriving at its conclusion, the court in *Applewhite* v. *City of Baton Rouge, supra,* 380 So.2d 119, explained why it was appropriate to impose vicarious liability on the employers of police officers who commit sexual assaults: "We particularly note that [the officer] was on duty in uniform and armed, and was operating a police unit at the time of this incident. He was able to separate the plaintiff from her companions because of the force and authority of the position which he held. He took her into police custody and then committed the sexual abuses upon her in the vehicle provided for his use by his employer. [¶] A police officer is a public servant given considerable public trust and authority. . . . [W]here excesses are committed by such officers, their employers are held to be responsible for their actions even though those actions may be somewhat removed from their usual duties. This is unquestionably the case because of the position of such officers in our society." (*Id.* at p. 121; see also *Turner* v. *State* (La.Ct.App. 1986) 494 So.2d 1292 [state held vicariously liable when National Guard recruiter told four applicants to undress for physical exam, then molested them].)

The City has also cited two federal decisions, *City of Green Cove Springs* v. *Donaldson* (5th Cir. 1965) 348 F.2d 197, and *Bates* v. *United States* (8th Cir. 1983) 701 F.2d 737, which concluded that under applicable state law the public entity involved could not be held vicariously liable for a rape committed by a police officer on duty. Neither decision is persuasive. Each failed to consider the significance of the extraordinary authority wielded by law enforcement officers, and in each instance the federal court was required to apply state law that is materially and substantively different from California law.

The final case cited by the City, *Desotelle* v. *Continental Cas. Co.* (1986) 136 Wis.2d 13 [400 N.W.2d 524], does not assist the City, for it supports our conclusion that the City can be held liable in this case. In *Desotelle*, the court

concluded that the question of whether an officer who commits a sexual assault is acting in the scope of his employment is one of fact, and the court upheld a determination by the trier of fact that an officer acted outside that scope when he committed a sexual assault. (400 N.W.2d at pp. 529-530.) Like the court in *Desotelle*, we reject the assertion that the appellate court should decide as a matter of law whether a law enforcement officer who commits a sexual assault is acting outside the scope of employment. The question of scope of employment is ordinarily one of fact for the jury to determine.

For the reasons set forth above, we hold that when, as in this case, a police officer on duty misuses his official authority by raping a woman whom he has detained, the public entity that employs him can be held vicariously liable. This does not mean that, as a matter of law, the public employer is vicariously liable whenever an on-duty officer commits a sexual assault. Rather, this is a question of fact for the jury. In this case, plaintiff presented evidence that would support the conclusion that the rape arose from misuse of official authority. Sergeant Schroyer detained plaintiff when he was on duty, in uniform, and armed. He accomplished the detention by activating the red lights on his patrol car. Taking advantage of his authority and control as a law enforcement officer, he ordered plaintiff into his car and transported her to her home, where he threw her on a couch. When plaintiff screamed, Sergeant Schroyer again resorted to his authority and control as a police officer by threatening to take her to jail. Based on these facts, the jury could reasonably conclude that Sergeant Schroyer was acting in the course of his employment when he sexually assaulted plaintiff.[12]

## CONCLUSION

Our society has entrusted police officers with enforcing its laws and ensuring the safety of the lives and property of its members. In carrying out these important responsibilities, the police act with the authority of the state. When police officers on duty misuse that formidable power to commit sexual assaults, the public employer must be held accountable for their actions. " 'It is, after all, the state which puts the officer in a position to employ force and which benefits from its use.' " (*Thomas* v. *Johnson* (D.D.C.

---

[12]The trial court permitted plaintiff, as a part of her showing of damages flowing from the rape, to present evidence of trauma she suffered as a result of the investigation and criminal prosecution of Sergeant Schroyer after the sexual assault. On appeal, the City argued that it was immune from liability for damages relating to the criminal prosecution. (See §§ 821.6, 815.2, subd. (b).) The Court of Appeal, however, did not reach the issue because of its conclusion that the City could not be held vicariously liable for any of the injuries suffered by plaintiff. We express no view as to the proper disposition of this issue, which must be addressed by the Court of Appeal upon remand by this court.

1968) 295 F.Supp. 1025, 1032, quoting Jaffe, *Suits Against Governments and Officers: Damage Actions* (1963) 77 Harv.L.Rev. 209, 229.)

The judgment of the Court of Appeal is reversed. The matter is remanded to the Court of Appeal for further proceedings consistent with this opinion.

Mosk, J., Broussard, J., and Panelli, J., concurred.

**ARABIAN, J.,** Concurring.—I join in the majority opinion but write separately to reflect on the incremental advance today's holding represents in the effort to redress the historical imbalance between victim and accused in sexual assault prosecutions. By its very nature, rape displays a "total contempt for the personal integrity and autonomy" of the victim; "[s]hort of homicide, [it is] the 'ultimate violation of self.' " (*Coker* v. *Georgia* (1977) 433 U.S. 584, 597, 603 [53 L.Ed.2d 982, 996, 97 S.Ct. 2861] (plur. opn. of White, J.; conc. and dis. opn. of Powell, J.).) Along with other forms of sexual assault, it belongs to that class of indignities against the person that cannot ever be fully righted, and that diminishes all humanity.

Some 16 years ago, in *People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845], this court eliminated from our law one of the more egregious evidentiary biases against rape victims by disapproving the use of Lord Hale's dictum[1]—embodied in then-CALJIC No. 10.22 (3d ed. 1970 bound vol.)—that rape is a charge easily made and difficult to defend, and that the victim's testimony should be viewed "with caution." (See Arabian, *The Cautionary Instruction in Sex Cases: A Lingering Insult* (1978) 10 Sw.U.L.Rev. 585.)

Our decision in that case helped inaugurate a wave of reform in the law of rape and other forms of sexual assault. Acknowledging the reality that rape victims were often victimized a second time by the criminal justice system, the Legislature enacted one of the nation's first "rape shield" laws, limiting the admissibility of evidence of a complainant's sexual history except under narrowly defined conditions and prohibiting an instruction that an "unchaste woman" is more likely to have consented to sexual intercourse. (Stats. 1974, ch. 569, pp. 1388-1389; Stats. 1974, ch. 1093, pp. 2320-2321; Evid. Code, §§ 782, 1103; Pen. Code, § 1127d; see *People* v. *Blackburn* (1976) 56 Cal.App.3d 685 [128 Cal.Rptr. 864]; cf. *Michigan* v. *Lucas* (1991) 500 U.S. __ [114 L.Ed.2d 205, 111 S.Ct. 1743].)

In 1978, California saw the birth of Penal Code section 289 (Stats. 1978, ch. 1313, p. 4300), criminalizing sexual assaults with foreign objects and

---

[1] 1 Hale, The History of the Pleas of the Crown 634 (1st Am. ed. 1847).

imposing substantial penalties for their commission. This was followed in 1979 by the extension of California's substantive rape statute to encompass rape by a spouse and the adoption of a gender neutral definition of the offense. (Stats. 1979, ch. 994, pp. 3383-3385; Pen. Code, §§ 261-264, 1127d.) In 1980, the Legislature eliminated the requirement of resistance as an element of rape (Stats. 1980, ch. 587, pp. 1595-1600; Pen. Code, §§ 261-262, 667.5, 1203.06 et seq.) and overruled our decision in *Ballard* v. *Superior Court* (1966) 64 Cal.2d 159 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416], by prohibiting trial courts from ordering a psychiatric examination of a witness or victim for the purpose of addressing credibility in a sexual assault prosecution. (Stats. 1980, ch. 16, p. 63; Pen. Code, § 1112; see *People* v. *Barnes* (1986) 42 Cal.3d 284 [228 Cal.Rptr. 228, 721 P.2d 110]; *People* v. *Haskett* (1982) 30 Cal.3d 841, 859, fn. 8 [180 Cal.Rptr. 640, 640 P.2d 776].) Also in 1980, California became the first state to recognize the value of protecting from disclosure confidential communications between sexual assault victims and therapists by enacting the sexual assault victim-counselor evidentiary privilege. (Stats. 1980, ch. 917, pp. 2915-2921; Evid. Code, § 1035 et seq.)[2] Several other states have since enacted a similar privilege.[3]

California, of course, was not alone in these efforts. Notably, the Legislatures of Michigan and New York and the drafters of the Model Penal Code developed reform-driven, gender neutral sexual offense legislation; other jurisdictions followed suit and the subject became "a key item on the feminist agenda across the United States throughout the 1970's."[4] However, this mosaic of change and the national consciousness it reflects should not erase our concern. Over the past generation, the incidence of forcible rape nationwide has climbed at a disturbing rate. According to one authoritative source, the frequency of the offense in the United States has doubled over the past twenty years.[5]

Society's response has been severe; mandatory prison sentences for sexual assault offenders and consecutive term enhancements for rape recidivists (Pen. Code, §§ 667.5, 1203.065) have halted many potential repeat offend-

[2]See Arabian, *The Sexual Assault Counselor-Victim Privilege: Protection of a Confidential Communication*, Los Angeles Daily Journal (Nov. 7, 1980) page 4.

[3]See, e.g., General Statutes of Connecticut, section 52-146k (1990); Florida Statutes, section 90.5035 (1990); Kentucky Revised Statutes Annotated, Official Edition, section 421.2151 (Michie 1991); Maine Revised Statutes Annotated, title 16, section 53-A (1989); and Annotated Laws of Massachusetts, chapter 233, section 20J (Law. Co-op. 1991).

[4]Estrich, Real Rape (1987) page 80 and following.

[5]Figures released by the federal Bureau of the Census show that the rate of *reported* forcible rapes per 100,000 increased nationally from 18.7 in 1970 to 37.6 in 1988. (U.S. Bureau of the Census, Statistical Abstract of the U.S.: 1990 (1990) p. 173.)

ers. But strengthened criminal sanctions are only part of an adequate response. Our holding today advances the cause of reform by providing a meaningful civil remedy to the victims of those who exploit unique institutional prerogatives to facilitate a sexual assault.

"All rape is an exercise in power, but some rapists have an edge that is more than physical."[6] A police officer is sworn to protect and to serve. In the pantheon of protection, we look to law enforcement officials as our first and last hope. When the police officer's special edge—the shield, gun and baton, the aura of command and the irresistible power of arrest—is employed to further a rape, the betrayal suffered by the victim is an especially bitter one.

"The bite of the law," Justice Frankfurter wrote, "is in its enforcement."[7] That maxim was never better served than here. Given the proper factual showing of misuse of official authority in the commission of a rape by a police officer, it is fair and consistent with time-honored principles of respondeat superior to impose liability vicariously on the public entity on whose account the officer occupied a position of authority and trust, and for the folly of its hire.

BAXTER, J., Concurring.—I concur in the judgment. The City of Los Angeles (the City) requested a jury instruction that virtually guaranteed it would be held liable for the rape by Officer Schroyer. The City should not now be heard to complain that the jury's verdict was erroneous.

I respectfully disagree, however, with the majority's reasoning and conclusion on the substantive question of vicarious liability. The majority presents at length its policy views on why governments should be strictly liable for the crimes of their police officers. However, these observations are largely irrelevant. The Legislature has prohibited such liability without fault except where a public employee was acting "within the scope of . . . employment." (Gov. Code, § 815.2, subd. (a).) The narrow issue in this case is whether an officer who deviates from duty and commits criminal acts entirely unrelated to his law enforcement responsibilities can *ever* be deemed "in the scope of . . . employment." For reasons I will explain, the answer to that question is "no."

---

[6]Brownmiller, Against Our Will: Men, Women and Rape (1975) page 256.

[7]*Fisher* v. *United States* (1946) 328 U.S. 463, 484 [90 L.Ed. 1382, 1394-1395, 66 S.Ct. 1318, 166 A.L.R. 1176] (dis. opn.).

INVITED ERROR

I. *The rule of invited error should bar the City's attack on the jury's verdict.*

Special instruction No. 3, requested by the City, stated: "An employer is liable for the wrongful acts of a police officer who, as a result of the exercise of his authority, legally causes injury even though the wrongful acts occurred without the employer's knowledge, were not related to the duties he was hired to perform, were not for the benefit of employee, and were done in violations [*sic*] of the employer's rules or grant of authority." A reasonable jury faced with this instruction would be hard pressed *not* to find vicarious liability. The components of the instruction bear emphasis. The jury was told the City was vicariously liable for the rape by Officer Schroyer even if:

a.  It occurred *without* the City's knowledge;

b.  It was *not* related to Officer Schroyer's duties;

c.  It was *not* for the City's benefit;

d.  It was *solely* for the personal benefit of Officer Schroyer; and

e.  It *violated* the City's rules.

Under the City's jury instruction, almost any imaginable form of police misconduct would support a finding of vicarious liability. If, for example, Officer Schroyer had "exercise[d] . . . his authority" by robbing a bank while on duty, his misconduct would equally have met the criteria for vicarious liability set forth in the City's instruction.

The City acknowledges the well-established rule of invited error. "Under the doctrine of 'invited error' a party cannot successfully take advantage of error committed by the court at his request." (*Jentick* v. *Pacific Gas & Elec. Co.* (1941) 18 Cal.2d 117, 121 [114 P.2d 343].) The rule precludes a party from challenging a jury instruction if he proposed it or a similar instruction. (*Ibid.*; *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 50 [123 Cal.Rptr. 468, 539 P.2d 36].) The City does not dispute that special instruction No. 3 was highly unfavorable to the City's own position at trial.

The City, however, contends it should not be held accountable for special instruction No. 3 because the City was merely trying to "make the best of a bad situation." According to the City, the trial court had informed counsel for

both parties that it would instruct the jury on the vicarious liability issue pursuant to the decision in *White* v. *County of Orange* (1985) 166 Cal.App.3d 566 [212 Cal.Rptr. 493] (*White*), in which the Court of Appeal held that a female motorist had stated a valid cause of action for vicarious liability against a county based on an alleged sexual assault by a deputy sheriff. The City asserts it objected on two grounds to an instruction proposed by plaintiff under *White*: (1) *White* should not be followed; and (2) the instruction proposed by plaintiff did not accurately reflect the holding in *White*. The City claims the trial court made clear its intention to give plaintiff's instruction unless the City submitted its own instruction under *White*. The City contends it should therefore be excused from having submitted the instruction that virtually assured an unfavorable verdict.

The City's argument on this point is flawed in two key respects. First, even if we accept as true the City's recollection of the facts, the City failed to object *on the record* to any proposed instruction on the vicarious liability issue until *after* the jury was instructed. A party must not be allowed to submit a crucial jury instruction and then, after the jury has been instructed and retired to deliberate, attempt for the first time on the record to make excuses for its own proposed instruction. Put simply, a party should not be allowed to create an after-the-fact objection under the guise of "clarifying" the record. It is hornbook law that an appellant must affirmatively show error by an adequate record. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 418, pp. 415-416.)

Faced with a dispute over jury instructions, the City should have provided for a contemporaneous record of the discussions between counsel and the trial court. Alternatively, the City could have moved under rule 36(b) of the California Rules of Court for a settled statement in place of a transcript of the alleged chambers conference regarding jury instructions. (*Lipka* v. *Lipka* (1963) 60 Cal.2d 472, 480-481 [35 Cal.Rptr. 71, 386 P.2d 671] [allowing augmentation of record to include unreported chambers conference].) The City did neither. Accordingly, the record does not show that the City made a *timely* objection to the proposed instruction on vicarious liability.

Second and equally important, the majority fails to grasp the fact that the fatal instruction was drafted by the City. When the City first raised its belated objection to an instruction based on *White, supra,* 166 Cal.App.3d 566, the trial court correctly observed that, "Now, however, on this instruction that you prepared, and which you felt was the law in accordance to [*sic*] *White,* the language was entirely your own and the court had no input nor did plaintiff's counsel." Faced with an instruction it did not like, the City had two choices: (1) object to the instruction and stand on its objection without submitting a different instruction; or (2) object to plaintiff's instruction and

submit an alternative one that the City believed to be a correct statement of the law. A party may not submit its own instruction and then challenge it as being incorrect. That is the essence of the invited-error rule. (*Jentick* v. *Pacific Gas & Elec. Co.*, *supra*, 18 Cal.2d 117, 121.)

The City cites no authority for its novel proposition that the City may challenge its own instruction as an attempt "to make the best of a bad situation." The rule is to the contrary. In *Jentick* v. *Pacific Gas & Elec. Co.*, *supra*, 18 Cal.2d 117, the court rejected the vicariously liable defendant's argument that its request for an erroneous instruction was not willful. "Defendant may not avoid the application of the doctrine by asserting that the error was not deliberately or willfully induced. The good faith of the defendant is immaterial. It is incumbent upon counsel to propose instructions that do not mislead a jury into bringing in an improper verdict. Whether deliberate or not, defendant's action was responsible for the erroneous instruction and verdict. Defendant must therefore accept them as correct." (*Id.*, at p. 122.) Either the same result should obtain in this case, or the majority should forthrightly overrule *Jentick*.

II.  *Reaching the merits of the vicarious liability issue serves little purpose and will create confusion.*

Plaintiff has only one interest in this court: obtaining an affirmance of the monetary judgment in her favor. We can, and should, grant her that relief on the basis of the City's invited error on the jury instruction. Any discussion of whether vicarious liability should arise in future cases serves no purpose for plaintiff. Yet the majority insists on a broad and potentially mischievous holding that local governments may be liable without fault if a police officer commits a crime that is somehow related to the authority wielded by virtue of peace officer status.

One must keep in mind the precise disposition of this case. The verdict against the City was returned pursuant to an instruction that the City was vicariously liable for the rape by Officer Schroyer because it was a "result of the exercise of his authority," even if it occurred *without* the City's knowledge, was *not* related to Officer Schroyer's duties, was *not* for the City's benefit, was *solely* for the personal benefit of Officer Schroyer, and *violated* the City's rules. There is no claim that the City was negligent in hiring Schroyer or had reason to know that he might take advantage of his position of authority to commit rape. The sole basis on which the City's liability is predicated is that he acted within the scope of his employment while committing a rape.

Despite the majority's effort to suggest some limitations on its holding, the practical result is clear: no matter how attenuated the relationship

between police misconduct and an officer's employment, if he takes advantage of the authority he acquires as an officer in order to commit the crime, he may be found to be acting within the scope of his employment, and the City will be liable for any damages he causes. This is an unprecedented expansion of liability which is unauthorized by the controlling governmental immunity statutes.

For the foregoing reasons, I would decide this case in plaintiff's favor solely on the ground of the City's invited error. Because the majority, however, decides the broader scope of employment issue, I address that too.

## VICARIOUS LIABILITY

I respectfully disagree with the majority's reasoning and conclusion that the City may be held vicariously liable for the injury caused by Officer Schroyer's criminal conduct. The majority imposes on the taxpayers of the City the financial responsibility for a rape committed by a police officer for his own gratification. No act can be more unrelated to the duties of a police officer than his rape of a member of the public he is sworn and paid to protect. The majority admits, as does the plaintiff, that the City was blameless. The proposed rule is therefore sweeping. Taxpayers may be strictly liable for almost any abuse of position by a police officer no matter how unrelated it is to his or her proper duties. I share the urge to make plaintiff whole—assuming that money can ever erase her pain. No compassionate person can escape outrage at the harm caused by this errant officer. This court's proper function, however, is not to search for deep financial pockets regardless of the law or practical consequences.

III.   *The City's liability is governed by statute.*

The stated cornerstone of the majority opinion is its view that, "The cost resulting from misuse of that [police] power should be borne by the community . . . ." (Maj. opn., *ante*, at p. 217.) The question of the City's liability is not a matter of judicial preference. The Legislature has enacted a comprehensive statutory system regulating the liability of public entities. (Gov. Code, § 810 et seq.) Under this scheme, "[a] public entity is liable for injury proximately caused by [the actionable misconduct] of an employee . . . *within the scope of . . . employment* . . . ." (*Id.*, § 815.2, subd. (a), italics added.) "Except as otherwise provided by statute[,] . . . [¶] [a] public entity is not liable for an injury . . . ." (*Id.*, § 815, subd. (a).) "Government[al] tort liability in California is governed completely by statute." (*Swaner* v. *City of Santa Monica* (1984) 150 Cal.App.3d 789, 797 [198 Cal.Rptr. 208].) "[T]he practical effect of [Government Code section 815] is to eliminate any *common law* governmental liability for damages arising out

of torts." (Sen. legis. committee com., 32 West's Ann. Gov. Code (1980 ed.) § 815, p. 168 [Deering's Ann. Gov. Code (1982 ed.) § 815, p. 134], italics added.)

The Legislature's intent to circumscribe liability is clear. In *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457], this court attempted to abrogate the entrenched doctrine of governmental tort immunity. The Legislature promptly responded by enacting the Moratorium Act of 1961 (former Civ. Code, § 22.3), which suspended the effect of *Muskopf* and reinstated the immunity. (Stats. 1961, ch. 1404, pp. 3209-3210.) At the Legislature's request, the California Law Revision Commission submitted a comprehensive report in 1963, which gave rise to the statutory system that now governs the field of public entity tort liability. (Although not officially titled, the legislation is commonly referred to as the Tort Claims Act.) This history makes clear that the Legislature was unwilling to accept the judicial expansion of tort liability attempted by the *Muskopf* court.

Professor Arno Van Alstyne was the California Law Revision Commission's chief consultant and much of his work gave rise to the present statutory system. He has explained that, "These provisions were intended to ensure that applicable immunity provisions of the California Tort Claims Act will generally prevail over its liability provisions." (Van Alstyne, Cal. Government Tort Liability Practice (Cont.Ed.Bar 1980) § 2.26, p. 67.) We have also noted the restrictive nature of the act. "[T]he intent of the act is not to expand the rights of plaintiffs in suits against governmental entities, but to confine potential governmental liability to rigidly delineated circumstances: immunity is waived only if the various requirements of the act are satisfied." (*Williams* v. *Horvath* (1976) 16 Cal.3d 834, 838 [129 Cal.Rptr. 453, 548 P.2d 1125] (opn. by Mosk, J.).)

The plain language of the act supports a restrictive view. Government Code section 815 provides an immunity except as "provided by *statute*." (*Ibid.*, italics added.) The Legislature did not provide for exceptions as provided by "*law*," which would have included court decisions. (Gov. Code, § 811.) This limitation also reflects the Legislature's awareness that questions of public entity liability are policy and fiscal questions better left to the Legislature than to the courts. The Legislature's intent to restrain judicial expansion of liability is made even clearer by its observation that, "The use of the word 'tort' had been avoided, however, to prevent the imposition of liability *by the courts* by reclassifying the act causing the injury." (Sen. legis. committee com., 32 West's Ann. Gov. Code, *supra*, § 815, p. 168 [Deering's Ann. Gov. Code, *supra*, § 815, p. 134], italics added.) The California Law Revision Commission further explained the problem of undue judicial inter-

ference: "Experience in states which have left the limits of liability to be determined by the courts has shown that liability insurance to protect the financial integrity of small public entities is at times prohibitively expensive or impossible to obtain when there is no defined limit to the potential extent of liability." (Recommendations Relating to Sovereign Immunity, No. 1, Tort Liability of Public Entities and Public Employees (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963) pp. 808-809 (hereafter Law Revision Commission Recommendations).)

The majority asserts that the statutory phrase "scope of employment" imports "general standards" of respondeat superior law into the Tort Claims Act and has been construed as broadly as the similar test used in private tort litigation. (Maj. opn., *ante*, at pp. 209-210.) Yet the majority applies to financially pressed local governments a startling and unwarranted *expansion* of the traditional respondeat superior doctrine.

It is ancient law that "[a] master is *not* liable for a crime or wilful injury, such as an assault, committed by the servant without his command or encouragement, though it may be in the course of, or in relation to, the service." (2 Stephen, New Commentaries on the Laws of England (1843) p. 278, italics added.) Moreover, under general tort law, an employee's injurious conduct arises in the "scope of employment" for purposes of vicarious liability where the conduct was "typical," "usual," "broadly incidental," or "inherent" in the employer's enterprise, but not where the conduct was so "unusual or startling," or constituted such a "[substantial deviation] from [the employee's] duties for personal purposes," that " 'it would seem unfair to include the [resulting] loss . . . among other costs of the employer's business. . . .' " (*Perez* v. *Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 968 [227 Cal.Rptr. 106, 719 P.2d 676]; see *Hinman* v. *Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 960 [88 Cal.Rptr. 188, 471 P.2d 988].)

Aside from his original detention of the intoxicated victim, Officer Schroyer's criminal attack had no relation whatever to the performance of his law enforcement duties. Rather, he deviated completely from his work assignment, in a manner all must concede was both "startling" and "unusual," to commit a sexual assault for personal gratification. Absent supportive legislation, such an outrageous sexual attack cannot be deemed an "inherent" or "broadly incidental" risk of law enforcement which the taxpayers should absorb as a cost of government. I cannot square the majority's radical departure from traditional respondeat superior law with the purposes of the Tort Claims Act.

IV. *The majority's extensive reliance on public policy is misplaced and unsupported.*

The majority considers at some length various "policy factors." This reliance on public policy is both unsupported by evidence and legally misplaced. The governing statutory scheme precludes us from imposing vicarious liability on a public employer as a matter of "policy." Liability may be imposed only for an employee's actionable misconduct "in the scope of . . . employment." The only issue presented is when, if ever, a police officer's intentional criminality can fairly be deemed "in the scope" of the officer's employment. Intentional criminal conduct entirely beyond the scope of an officer's law enforcement duties cannot meet that test.

A. *Statutory nature of question*

As noted above, we are restricted to deciding this case in light of the comprehensive *statutory* scheme that governs public entity liability. In appropriate cases, consideration of public policy may assist the court in construing a statute. However, because the clear legislative intent was to *restrict* government's liability, this court should not impose liability absent a clear indication the Legislature intended such result. The majority does not undertake such an analysis and refers only tangentially to the statutes. Its opinion offers no reasoned basis to conclude that the Legislature intended to bring all criminal misuse of an officer's status, power, or authority, however flagrantly unrelated to duty, within the "scope of [the officer's] employment."

Even assuming we were free to resolve the policy question, I am troubled by the majority's incomplete discussion of the competing public policies. Whether plaintiff should recover for her injuries is only one side of the equation. The other side is whether the taxpayers of the City should be forced to pay for those injuries. The public fisc is not infinite. To the contrary, in this era of limited public resources, every expenditure for one purpose requires a withdrawal of funds for another purpose. Compensating the plaintiff is a worthy and sympathetic goal. Whether it is more worthy than other public purposes is a question beyond our right or ability to answer. Professor Van Alstyne has testified that, "[T]he costs and the funding problems are one of the most difficult problems in the whole field of tort liability . . . in the area of government torts particularly . . . ." (Hearings on Government Liability Before the Joint Com. on Tort Liability (Oct. 31, 1977) p. 33.)

The inescapable truth is that in the modern era, payments from the public purse involve hard choices of priorities. For example, in 1986 the voters

enacted Civil Code section 1431.1 to restrict liability for noneconomic damages. The voters' findings and declaration of purpose stated, "Local governments have been forced to curtail some essential police, fire, and other protections because of the soaring costs of lawsuits and insurance premiums." (Civ. Code, § 1431.1, subd. (c).) The effect of tort judgments on public resources is significant. A court should not ignore fiscal reality when expanding the frontier of tort liability. If a court wishes to sit as a "super-Legislature," the court should wrestle with the same vexing problems that arise in the legislative arena and should be subject to the same electoral pressures faced by legislators.

Of course, the Legislature (or the electorate itself) is best equipped to consider empirical evidence, e.g., the frequency of police rape, and to make the hard choices as to where public money will be spent. (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 740 [257 Cal.Rptr. 708, 771 P.2d 406] [leaving consideration of empirical data to the Legislature]; *J. C. Penney Casualty Ins. Co.* v. *M. K.* (1991) 52 Cal.3d 1009, 1028 [278 Cal.Rptr. 64, 804 P.2d 689] [noting importance of Legislature's consideration of empirical data].) We would do well to pay heed to the observation of an English jurist that public policy "is a very unruly horse, and when once you get astride it you never know where it will carry you." (*Richardson* v. *Mellish* (1824 Bing.) 103 Eng. Rep. 294, 303.) Courts should be extremely reluctant to decide for the public how its money should be spent. (*Sands* v. *Morongo Unified School Dist.* (1991) 53 Cal.3d 863, 941 [281 Cal.Rptr. 34, 809 P.2d 809] (dis. opn. of Baxter, J., noting importance of not interfering with community-based decisions).)

The majority's legislative decision to allocate public funds is especially bothersome in light of the absence of any factual support for many of the majority's critical assumptions. The majority cites no evidence for its sweeping pronouncements that vicarious employer liability for police sexual misconduct will encourage preventive measures that do not hinder the vital law enforcement function. Indeed, both common sense and prior commentary by this court (see discussion, *post*) suggest the contrary.

B. *Source of the majority's policy factors*

The majority relies almost entirely on policy factors set forth in the lead opinion in *John R.* v. *Oakland Unified School Dist.* (1989) 48 Cal.3d 438 [256 Cal.Rptr. 766, 769 P.2d 948] (*John R.*).) This reliance is flawed, even puzzling, in several respects.

1. The *John R.* court, *supra*, 48 Cal.3d 438, *declined* to impose vicarious liability for a sexual assault by a schoolteacher on a pupil. A

decision rejecting vicarious liability provides questionable support for an expansion of such liability. Even one of the two dissenters on the liability issue observed that, "[V]icarious liability for sexual assaults should be recognized as the exception, not the rule." (*Id.*, at p. 465 (conc. and dis. opn. by Kaufman, J.).) Another critic of the *John R.* decision properly called it "an extraordinarily broad rule" against vicarious liability. (*Kimberly M.* v. *Los Angeles Unified School Dist.* (1989) 215 Cal.App.3d 545, 550 [263 Cal.Rptr. 612] (conc. opn. of Johnson, J.).) Moreover, when *John R.* was decided, we had already granted review in this case. To make clear that we were not prejudging this case, the lead opinion in *John R.* stressed that we were *not* deciding whether a prior Court of Appeal decision imposing vicarious liability for a sexual assault by a police officer ". . . was properly decided *or whether the job-created authority theory has any validity in evaluating vicarious liability for the torts of police officers.*" (48 Cal.3d at p. 452 (lead opn. by Arguelles, J.), italics added.) The lead opinion could not have made more clear that we were not deciding the issue now before us. (*Liu* v. *Republic of China* (9th Cir. 1989) 892 F.2d 1419, 1431 [noting that we "specifically declined" in *John R., supra,* 48 Cal.3d 438, to decide the scope of vicarious liability for police misconduct].)

2.  In light of the express disclaimer in *John R., supra,* 48 Cal.3d 438, 452, that we were not deciding the issue of vicarious liability for police rape, any observations in the lead opinion were the barest of dictum, if even that. We have made clear that, " '[T]he language of an opinion must be construed with reference to the facts presented by the case, and the positive authority of a decision is coextensive only with such facts.' " (*Brown* v. *Kelly Broadcasting Co., supra,* 48 Cal.3d 711, 734-735, quoting *River Farms Co.* v. *Superior Court* (1933) 131 Cal.App. 365, 369 [21 P.2d 643].) This is especially so when a court takes pains to stress the narrowness of its decision. The *John R.* lead opinion, *supra,* 48 Cal.3d 438, raised a red flag to warn against subsequent reliance on the decision. The present majority takes that flag and lofts it as a standard for a view the *John R.* court never adopted.

3.  Most important, the policy discussion in *John R., supra,* 48 Cal.3d 438, was in an opinion signed by *only two* justices of this court. (There were four separate opinions.) Even the other three justices who agreed there should be no vicarious liability declined to sign the portion of the lead opinion dealing with that issue. Instead, they chose to make clear that they concurred only "in the majority's *holding*" of no vicarious liability. (*Id.*, at p. 455 (conc. and dis. opn. of Eagleson, J.), italics added.) Except to its precise holding of *no* liability, the lead opinion stated a minority view and provides no authority for any proposition in a subsequent case. (*County of San Mateo* v. *Dell J.* (1988) 46 Cal.3d 1236, 1241, fn. 5 [252 Cal.Rptr. 478, 762 P.2d 1202]; *Farrell* v. *Board of Trustees* (1890) 85 Cal. 408, 416

[24 P. 868].) This is hornbook law. "No opinion has any value as a precedent on points as to which there is no agreement of a majority of the court." (9 Witkin, Cal. Procedure, Appeal, *supra*, § 808, at p. 788.)

4. Even if we were to look to *John R.*, *supra*, 48 Cal.3d 438, for the type of general guidance we might seek in a treatise or plurality opinion, it would not support the majority's expansion of vicarious liability. The policy factors noted in the lead opinion weigh *against* vicarious liability in this case. The majority, however, applies them erroneously and inconsistently to impose liability.

### a. *Allocation of the risk*

The modern justification for vicarious liability is " ' "a deliberate allocation of a risk." ' " (*John R.*, *supra*, 48 Cal.3d 438, 450, quoting *Hinman* v. *Westinghouse Elec. Co.*, *supra*, 2 Cal.3d 956, 959-960.) The *John R.* lead opinion acknowledged that society benefits from the authority placed in teachers and noted that, "[I]t can be argued that the consequences of an abuse of that authority should be shared on an equally broad basis." (48 Cal.3d at p. 452.) The lead opinion, however, concluded this factor weighed *against* vicarious liability because the connection between the authority conferred on teachers and the abuse of that authority by engaging in sexual misconduct is too attenuated to allocate the risk to the employer. That conclusion equally weighs against liability in this case.

Rather than relying on the result in *John R.*, *supra*, 48 Cal.3d 438, or even the lead opinion's application of this factor, the present majority relies heavily on a statement in the lead opinion that the authority of a police officer "plainly surpasses that of a teacher over a student." (*Id.*, at p. 452.) This statement is unpersuasive: (i) It was a passing observation in dictum. (ii) It was in an opinion of only two justices. (iii) The court was fully aware this case was pending when we decided *John R.* As explained above, the lead opinion expressly stated we were *not* deciding "whether the job-created authority theory has any validity in evaluating vicarious liability for the torts of police officers." (*Ibid.*) In light of these multiple limitations and disclaimers, it would be hard to find a more slender reed on which to conclude that *John R.* supports vicarious liability in this case.

Moreover, I am not persuaded by the speculation in the *John R.*, *supra*, 48 Cal.3d 438, lead opinion and the present majority opinion that a police officer's authority "plainly surpasses that of a teacher over a student." (*Id.*, at p. 452.) The majority's discussion, like the lead opinion in *John R.*, fails to provide support for this assertion, and common sense suggests to the contrary. A schoolteacher alone at his home with an impressionable child has as

much power and opportunity to commit a sexual assault against the child, especially one of tender years, as a police officer has to commit an assault against a citizen. Justice Kaufman pointed out in *John R., supra*, that the circumstances of the case "virtually *guaranteed* that the teacher could act with impunity . . . ." (*Id.*, at p. 465 (conc. and dis. opn. of Kaufman, J.), original italics.) A teacher may have even greater apparent "authority" than a police officer. None of the indicia of police power cited by the majority—the uniform, badge, and gun—creates any appearance that the officer has the authority to rape. Plaintiff did not believe Officer Schroyer was authorized to have sexual intercourse with her. To the contrary, she struggled to avoid being raped. A young child, however, may be induced to submit to a teacher's sexual depravity by being led to believe that the teacher has the authority to commit sex acts.

The allocation of risk, or loss spreading as it is sometimes called, should be reasonable and informed as well as deliberate. The decision whether to impose liability requires a delicate balancing of competing interests, particularly when the defendant at law is a public entity and the defendants in fact are the taxpayers. The determination is best left to the Legislature. Neither of the decisions on which the *John R.* lead opinion relied for the notion of risk allocation involved governmental entities. (*Hinman* v. *Westinghouse Elec. Co., supra,* 2 Cal.3d 956; *Perez* v. *Van Groningen & Sons, Inc., supra,* 41 Cal.3d 962.)

In its comprehensive study that gave rise to the Tort Claims Act, the California Law Revision Commission explained, "The problems involved in drawing standards for governmental liability and governmental immunity are of immense difficulty. Government cannot merely be made liable as private persons are, for public entities are fundamentally different from private persons. . . . Private persons do not prosecute and incarcerate violators of the law . . . . Unlike many private persons, a public entity often cannot reduce its risk of potential liability by refusing to engage in a particular activity, for government must continue to govern and is required to furnish services that cannot be adequately provided by any other agency." (Law Revision Com. Recommendations, *supra,* at p. 810.) The California Law Revision Commission and the Legislature required enormous amounts of empirical data and many months of collective consideration to reach difficult decisions. The majority acknowledges no difficulty whatsoever and gives no consideration to the potential effects of imposing strict liability on the City.

The notion of risk allocation merits special mention in another regard. We have long emphasized that one factor to be considered in determining whether to impose a particular type of tort liability is "the availability, cost,

and prevalence of [liability] insurance for the risk involved." (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) The lead opinion in *John R., supra,* 48 Cal.3d 438, reiterated this concern: "The imposition of vicarious liability on school districts for the sexual torts of their employees would tend to make insurance, already a scarce resource, even harder to obtain and could lead to the diversion of needed funds from the classroom to cover claims." (*Id.,* at p. 451.) The high cost and widespread unavailability of municipal liability insurance have been widely reported and studied. (See, e.g., Hearings on Municipal Liability Insurance (Dec. 1975) Before the Joint Assem. Coms. on Finance, Insurance, and Commerce and Local Government; Hearings on Liability Insurance: Threat to the California Dream (Aug. 1986) Before the Sen. Com. on Insurance, Claims, and Corporations; California Citizens' Commission on Tort Reform, Staff Background Paper: Government Liability (1977) pp. 24-25.) The unavailability of public liability insurance reached such crisis proportions that in 1986 it became one of the key arguments in favor of Proposition 51, which the voters enacted to restrict the liability of defendants (including public entities) for noneconomic injuries. (See Ballot Pamp., argument in favor of Prop. 51 as presented to the voters, Primary Elec. (June 3, 1986) p. 34.) The majority, however, gives no consideration to this traditionally recognized factor.

Our proper function is not to usurp the Legislature's budgetary function of allocating risk for public entity torts. Even if the question were ours to answer, we do not have before us sufficient empirical data on which to make the difficult choice between competing fiscal priorities.

> b. *Imposing liability on the employer to prevent recurrence of the tortious conduct*

The *John R.* lead opinion remarked that vicarious liability can be "a spur toward accident prevention." (48 Cal.3d at p. 451.) On the other hand, *John R.* recognized that a public entity must not be presented with such an onerous, impossible, or impractical prevention burden that its proper functions are threatened. (*Ibid.*) This latter principle was a cornerstone of the Tort Claims Act. The California Law Revision Commission emphasized that, "The basic problem is to determine how far it is desirable to permit the loss distributing function of tort law to apply to public entities *without unduly frustrating or interfering with the desirable purposes for which such entities exist.*" (Law Revision Com. Recommendations, *supra,* at p. 810, italics added.)

Rape, of course, is no accident. It results from an individual's conscious decision to commit the outrageous act despite all moral and legal sanctions.

Hence, it cannot be prevented in the way a city might train its officers in safe driving. Rape is a serious crime punishable by imprisonment (Pen. Code, §§ 261, 264), and a compensable civil wrong as well. We assume such considerations informed the *John R.* lead opinion's observation that prevention and deterrence "[play] little role in the allocation of responsibility for the sexual misconduct of employees generally . . . ." (48 Cal.3d at p. 451.)

Here there is no suggestion that the City negligently failed to screen Officer Schroyer's background and character, or that it failed to exercise due care in training and supervising him. The majority fails to explain what additional measures the City could or should practically have taken to prevent his intentional sexual misconduct. Nor have we any evidence about the costs or benefits of any such measures. Indeed, as the *John R.* lead opinion observed, excessive restrictions on contacts between public employees and citizens are likely to undermine the employees' public function. (48 Cal.3d at p. 451.) Common sense suggests that what was true for education in *John R.* has equal or greater validity in the context of law enforcement.

The premise that the City should adopt further regulations for police training and conduct also runs afoul of Government Code section 818.2. Section 818.2 provides that "[a] public entity is not liable for an injury caused by adopting or failing to adopt an enactment or by failing to enforce any law." The term "enactment" includes ordinances and regulations. (Gov. Code, § 810.6.)

The majority's inability to suggest how vicarious liability might deter sexual misconduct by public employees demonstrates that we are ill equipped to dictate such matters. As the California Law Revision Commission explained, "in many cases decisions made by the legislative and executive branches should not be subject to review in tort suits for damages, for this would take the ultimate decision-making authority from those who are responsible politically for making the decisions." (Law Revision Com. Recommendations, *supra*, at p. 810.) "The remedy for officials who make bad law, who do not adequately enforce existing law, or who do not provide the people with services they desire is to replace them with other officials." (*Id.*, at p. 817.)

Of course, the paradoxical result of the majority's holding is that no matter what the City does, it may be held responsible for a police officer's criminal conduct including offenses such as this rape. The City's police department already has a policy that imposes several reporting requirements on officers who transport members of the opposite sex. (See maj. opn., *ante*, at p. 218, fn. 10.) The City's assistant chief of police in charge of personnel and training testified that department policy requires a male officer trans-

porting a female arrestee to record the time and mileage of his police vehicle so that the arrestee's whereabouts could be monitored and verified. Department policy also prohibited Officer Schroyer from transporting plaintiff to her residence. Obviously, these policies did not prevent the rape in this case.

Under the majority's reasoning, one purpose of vicarious liability in this case would be to encourage the City to adopt further, undefined measures. By adopting the rules then in effect, the City, however, may have done all that it could reasonably do without imposing an undue burden on the police's resources and mission—the same concern expressed in *John R.* Indeed, if the City did not act reasonably, it could have been found negligent. Plaintiff, however, dismissed her cause of action for negligence, thereby indicating that the City had done all it could *reasonably* be expected to do. Plaintiff fails to propose any regulation that would be effective without being unreasonably restrictive on effective law enforcement.

The majority's treatment of the regulations adopted by the City is self-contradictory. At one point, the majority approvingly notes a rule adopted by the San Francisco Police Department relating to the transport of females by male officers. The majority asserts this rule "illustrates the type of measure that a law enforcement agency can take to reduce the incidence of sexual assaults by police officers on duty." (Maj. opn., *ante,* at p. 215, fn. 7.) Only a few paragraphs later, the majority notes that the City has a similar regulation. Thus, the effect of the majority's holding is that the City is liable *despite* its adoption of measures vicarious liability is designed to encourage.[1]

The proper question is whether vicarious liability would deter future misconduct without undue adverse consequences for the police function. If we impose liability, the City has two choices: (1) It can conclude it has already done all that it can reasonably do and accept the fact that errant officers might on occasion rape citizens, thereby subjecting the City to vicarious liability. If this is the result, vicarious liability has no deterrent effect. (2) Alternatively, the City can take measures beyond those already adopted. It requires little common sense to imagine that such measures might lead to the same result disapproved in *John R., supra,* 48 Cal.3d 438—undue interference with the City's ability to perform its mission of providing police protection. In rejecting vicarious liability for a teacher's sexual molestation of a child, the *John R.* lead opinion explained that, "Although it is unquestionably important to encourage both the careful selection of these employ-

---

[1]The majority actually *penalizes* the City for adopting its regulations by observing that their adoption shows sexual misconduct by officers is not unexpected. (Maj. opn., *ante,* at p. 218, fn. 10.)

ees and the close monitoring of their conduct, such concerns are, we think, better addressed by holding school districts to the exercise of due care in such matters and subjecting them to liability only for their own direct negligence in that regard. Applying the doctrine of respondeat superior to impose, in effect, strict liability in this context would be far too likely . . . to induce districts to impose such rigorous controls on activities of this nature that the educational process would be negatively affected." (*Id.*, at p. 451.) The same reasoning applies with equal force in this case.

Whether vicarious liability will have a deterrent effect without undue impediment to a public function depends on what measures a public entity has already taken, what additional measures it can take, and what the effects of those measures will likely be. The majority's holding will allow liability in future cases regardless of whether it will help attain the goal of deterrence or whether it will unduly restrict an essential public function. At a minimum, the question whether vicarious liability is appropriate should depend on the particular facts of each case. In *John R.*, even Justice Kaufman, who vigorously dissented in favor of vicarious liability, explained that, "*Respondeat superior is a fact-specific determination*; a holding adverse to the district would necessarily be limited to the uniquely compelling facts of this case." (48 Cal.3d at p. 465 (conc. and dis. opn. of Kaufman, J.), italics added.) By contrast, the majority result here is absolute and not tethered to any factual basis.

### c. *Assurance of compensation to accident victims*

The *John R.* lead opinion, *supra*, 48 Cal.3d 438, concluded that the general goal of compensating accident victims weighed *against* imposing vicarious liability for a sexual assault. "The [sexual] acts here differ from the normal range of risks for which costs can be spread and insurance sought. [Citation.] The imposition of vicarious liability on school districts for the sexual torts of their employees would tend to make insurance, already a scarce resource, even harder to obtain, and could lead to the diversion of needed funds from the classroom to cover claims." (*Id.*, at p. 451.) The same reasoning applies equally to the present case. Imposing vicarious liability on cities for employee-committed rapes indisputably will increase the cost of insurance and will also decrease its availability.[2]

[2]The concern over lack of insurance may apply even more strongly in this case. After *John R.*, *supra*, 48 Cal.3d 438, we held that Insurance Code section 533 excludes coverage for sexual molestation of a child as a matter of law. (*J. C. Penney Casualty Ins. Co. v. M. K.*, *supra*, 52 Cal.3d 1009.) The logical corollary is that coverage for rape is also excluded. Like child molestation, rape "is *always* intentional, it is *always* wrongful, and it is *always* harmful." (*Id.*, at p. 1025, original italics.) In *John R.*, *supra*, 48 Cal.3d 438, the lead opinion was

Perhaps to avoid this difficulty, the majority makes an elliptical argument as to legislative intent, stating that, by not enacting governmental immunity for violent police misconduct, the Legislature has demonstrated that vicarious liability is an appropriate method for ensuring victim compensation. However, the Legislature's failure to expressly *preclude* liability is not a valid indicator that the legislative purpose was to allow such liability.

The Legislature *has* provided that vicarious liability may be imposed only for a public employee's actionable misconduct "in the scope . . . of employment." Where, as here, the employee's intentional criminal conduct was a spontaneous personal deviation from duty and bore no relationship to his work performance, the Legislature's standard for vicarious liability has not been met.

I am not persuaded that ensuring compensation for victims is a dispositive concern in any event. It is a truism to state that ensuring compensation weighs in favor of vicarious liability. The deeper the defendant's pocket, the easier the plaintiff is compensated. If ensuring compensation were the only goal, vicarious liability should apply against all employers in all cases. However, as the result in *John R.*, *supra*, 48 Cal.3d 438, demonstrates, the sympathetic desire to compensate the injured is not a sufficient basis on which to impose vicarious liability.

Our decisions in other areas reinforce this principle. For example, prescription drugs occasionally have grievous, even fatal, side effects upon innocent victims. We recently held, however, that a manufacturer of a defectively designed drug cannot be held strictly liable. (*Brown* v. *Superior Court* (1988) 44 Cal.3d 1049, 1061 [245 Cal.Rptr. 412, 751 P.2d 470].) Writing for a unanimous court in *Brown*, Justice Mosk explained that despite occasional "unfortunate consequences" to sympathetic victims, the public interest in the development and availability of prescription drugs weighed against liability without fault. (*Id.*, at pp. 1061-1065.) Similarly, in *Belair* v. *Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 564-565 [253 Cal.Rptr. 693, 764 P.2d 1070], we held that strict liability was not appropriate in an inverse condemnation action for property damaged by public flood control projects. We found, in effect, that the desire to compensate individual injuries was outweighed by important public need for such projects.

The public has equally compelling interests in adequate law enforcement and preservation of public funds. A ruling that the public must bear the cost

---

concerned with scarce insurance. In this case, we might be faced with a legally mandated unavailability of insurance because Insurance Code section 533 arguably precludes coverage for a defendant held vicariously liable, despite contrary dictum in an old opinion (*Arenson* v. *Nat. Automobile & Cas. Ins. Co.* (1955) 45 Cal.2d 81, 84 [286 P.2d 816]).

of all police misconduct merely because the public benefits from law enforcement is inconsistent with the spirit of *Brown* and *Belair*.

V.  *The majority opinion will have adverse practical effects.*

The theoretical and practical ramifications of the majority's holding are sweeping. At a minimum, the majority opinion will permit imposition of vicarious liability whenever an on-duty police officer commits rape or some other sexual assault against a citizen the officer has detained by invoking his official authority. (Maj. opn., *ante*, at p. 221.) It is difficult to see how a jury could find, consistent with the majority opinion, that a uniformed officer who detains and sexually assaults a motorist was not acting in the course and scope of his employment.

The majority purports to limit its holding to cases in which an officer "exercises" or "misuses" his authority. Indeed, the opinion stresses that vicarious liability is appropriate here because Office Schroyer committed his criminal act while "on duty" and "in uniform." But the majority's underlying logic extends far beyond these limited circumstances. Once the majority's fundamental premise is accepted, its efforts to limit its ruling are largely illusory.

The majority's conclusions rest on the principle that a police officer's special power and authority allow him to impose his will on citizens. But this power and authority are limited neither to uniformed officers, nor to on-duty hours. Officers have law enforcement responsibility even when off duty, and their jurisdiction in certain situations is statewide. (See, e.g., Pen. Code, § 830.1, subd. (a)(3).) Moreover, an officer's special power to intimidate, if any, does not depend on whether he is actually on duty or in full uniform. If the officer acts in uniform, *or* displays his badge, *or* brandishes a regulation firearm, *or* even mentions his or her status, the officer implicitly uses state-conferred power and ability to subjugate the victim. Under the majority's reasoning, a jury would be hard pressed to find that misconduct committed under such circumstances was outside "the scope of . . . employment." (See, e.g., Silver, Police Civil Liability (1991) § 6.07, p. 6-12 ["[T]he issue of 'off' vs. 'on' duty is usually not critical where, for instance, the officer identifies himself or uses a weapon."].)

Rather than consider or even acknowledge this consequence of its holding, the majority contends that cases in which courts have refused to impose vicarious liability for sexual misconduct are "distinguishable" because the officers were off duty. However, examination of these decisions discloses no such dispositive distinction. In *Gambling v. Cornish* (N.D.Ill. 1977) 426 F.Supp. 1153, the court did not decide whether the raping officers were on or

off duty. Rather, the court stated that, even assuming they were on duty, there was no vicarious liability. (*Id.*, at p. 1155.) Similarly, in *Bates* v. *Doria* (1986) 150 Ill.App.3d 1025 [502 N.E.2d 454], the court rejected liability, not because the officer was off duty, but because the rape was outrageous and therefore beyond the scope of his employment.

The logical consequence of the majority's holding is demonstrated by one of the out-of-state cases on which it relies. In *Applewhite* v. *City of Baton Rouge* (La.Ct.App. 1979) 380 So.2d 119, the court upheld vicarious liability for a rape committed by an on-duty police officer. The significance for our case is that, in support of its conclusion, the court relied on prior Louisiana decisions that imposed vicarious liability for torts committed by *off-duty* officers. (*Id.*, at pp. 121-122, citing *Cheatham* v. *Lee* (La.Ct.App. 1973) 277 So.2d 513; *Borque* v. *Lohr* (La.Ct.App. 1971) 248 So.2d 901.) The majority's reliance on *Applewhite, supra,* is curious because the case refutes the majority's attempted distinction between on-duty and off-duty misconduct.

The majority's logic will also extend beyond police officers. Part 2, title 2, chapter 4.5 of the Penal Code grants peace officer status to a wide variety of law enforcement officers. They include sheriffs, marshals, constables, and inspectors for district attorneys. Under appropriate circumstances, peace officer status is conferred on dental examiners, voluntary fire wardens, horse racing board investigators, and many other persons. (Pen. Code, § 830.3.) Like police, some of these officers are authorized to carry firearms. (*Ibid.*) If one of these types of officers uses his weapon or asserts his authority in order to facilitate a rape, it is difficult to see how vicarious liability could be denied under the majority opinion.

The majority opinion is also unlimited in terms of the types of misconduct that will give rise to liability. Rape, robbery, and murder serve no public or police function. Yet the majority's holding seems to permit imposition of vicarious liability for all these crimes if the perpetrator made any use of official trappings or weapons or if the victim had knowledge of the attacker's connection to law enforcement and submitted accordingly. The implications of that conclusion are daunting.

In sum, the principles espoused by the majority have the potential to convert blameless public agencies into liability insurers for much, if not all, of the intentional misconduct committed by peace officers in their employ. Unlike commercial insurers, the innocent agencies can neither define the limits of their coverage nor collect premiums to finance it. Moreover, as we have seen, they may be both legally and practically barred from transferring their exposure to a commercial insurer. The majority fails to persuade me that law or public policy warrants such a result.

VI.    *Prior court decisions weigh against vicarious liability.*

As the court of last resort on this question of state statutory construction, we are not bound by the decisions of our sister states' courts. They do, however, provide guidance in determining whether our decision will be consistent with mainstream thinking on this issue. (*Delaney* v. *Superior Court* (1990) 50 Cal.3d 785, 799, fn. 9 [268 Cal.Rptr. 753, 789 P.2d 934].) Those decisions weigh against imposing liability. (The thrust of the majority on this point is defensive, i.e, trying to distinguish cases that decline liability.)

In *Bates* v. *United States* (8th Cir. 1983) 701 F.2d 737, the court affirmed a summary judgment in favor of the federal government in an action arising from rapes and murders committed by a military policeman. The majority attempts to downplay the decision's significance by emphasizing that the federal court was applying state law. The attempted distinction is misplaced. The majority does not dispute that the decision was a correct application of Missouri law. The decision is therefore entitled to the same consideration that the majority gives to the Louisiana and Wisconsin state court decisions on which the majority relies.

*Bates* v. *United States, supra,* 701 F.2d 737, does not stand alone. In *City of Green Cove Springs* v. *Donaldson* (5th Cir. 1965) 348 F.2d 197, the court held as a matter of law that an on-duty police officer was not within the scope of his employment when he arrested and raped a female motorist. (*Id.,* at p. 202.) In *Gambling* v. *Cornish, supra,* 426 F.Supp. 1153, the court held that two policemen who raped and committed other sexual acts on a citizen were not within the scope of their employment, regardless of whether they were on or off duty. (*Id.,* at p. 1155.) The court explained that, "[W]hile the doctrine of respondeat superior should be broadly applied when a police officer is involved, the line must be drawn somewhere." (*Ibid.*) In *Bates* v. *Doria, supra,* 502 N.E.2d 454, the court affirmed a summary judgment in favor of a county in an action arising from a rape committed by an off-duty deputy sheriff. The majority attempts to distinguish the case on the ground that the officer was off duty. This fact played no part in the court's decision. The rationale of the decision was that the rape was outrageous and was committed solely for the officer's benefit. (*Id.,* at p. 457.) Those facts would remain true regardless of whether the officer was on duty or off duty.

The two cases on which the majority relies are not persuasive. In *Desotelle* v. *Continental Cas. Co.* (1986) 136 Wis.2d 13 [400 N.W.2d 524], the court affirmed a judgment of *no* vicarious liability on the ground that the jury's verdict was supported by the evidence. This fact-specific holding provides

little guidance one way or the other for our case. That the facts of the case supported the jury's verdict does not mean the facts in our case support this jury's verdict. In *Applewhite* v. *City of Baton Rouge, supra*, 380 So.2d 119, the court affirmed a judgment against a city for rapes committed by two on-duty officers. Although the result supports the majority's conclusion, the Louisiana Court of Appeal's discussion of the issue was brief—less than a page—and did not consider the significant issues raised by imposing liability. More important, neither case (*Desotelle, supra*, 400 N.W.2d 524; *Applewhite, supra*, 380 So.2d 119) was decided under a comprehensive statutory scheme like California's that governs public entity liability.

## VII. *Conclusion*

I concur in the judgment reversing the Court of Appeal decision. I do so on the narrow basis of the City's invited error as to the jury instruction on the vicarious liability issue. I respectfully decline, however, to join the majority's unnecessary holding that a police officer may act "in the scope of . . . employment," thus exposing his blameless public employer to strict tort liability, when the officer rapes a citizen. In the absence of contrary legislation, I conclude, an officer may never be deemed within the "scope of employment" when he or she deviates from work duties to commit a crime unrelated to the performance of law enforcement responsibilities. Whether the taxpayers must absorb the cost of such individual misconduct is a subject within the exclusive purview of the Legislature, which cannot have anticipated this result.

Lucas, C. J., concurred.