Filed 7/7/21  Krystle V. v. Cal. Department of Motor Vehicles CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| KRYSTLE V., | B301643 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC666823) |
| v. |  |
| CALIFORNIA DEPARTMENT OF MOTOR VEHICLES, |  |
| Defendant and Respondent. |  |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel S. Murphy, Judge.  Affirmed.

Valencia & Cywinska, Mark Joseph Valencia and Izabela Cywinska Valencia for Plaintiff and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Danielle F. O'Bannon, Assistant Attorney General, Catherine Woodbridge, Benjamin Barnouw and Kenneth G. Lake, Deputy Attorneys General, for Defendant and Respondent.

* * * * * *

Krystle V. (appellant) appeals from a final judgment entered in favor of the respondent California Department of Motor Vehicles (DMV) in this action for sexual battery. Appellant's complaint alleged that DMV employee Manuel Llamzon engaged in sexual battery and made sexually offensive comments to her during a driving test. The trial court granted DMV's motion for summary judgment on the ground that DMV could not be liable under either a theory of respondeat superior or ratification, as a matter of law.

We find no error and affirm the judgment.

## FACTUAL BACKGROUND[1]

### Appellant's allegations

On June 23, 2016, appellant presented herself at the San Pedro office of the DMV to take her first driving test. She was then 21 years old, nervous, and anxious to pass the test. She feared that if she failed, it would adversely affect her anticipated employment for which she needed a driver's license.

Appellant waited in the drive test lane until Llamzon approached and told her he would be her DMV examiner.[2] He told appellant's friends to get out of the car, and he entered the front passenger side of appellant's vehicle. Llamzon and appellant were then the only two people in the vehicle. Llamzon asked appellant if she wanted to remove her sweater because it

---

[1] Because this case comes to us on summary judgment, we must view the facts presented in the light most favorable to the appellant. For the purpose of this appeal we assume the truth of appellant's version of the events.

[2] Llamzon was then a DMV licensing registration examiner (LRE).

2

was hot.  Appellant declined.  The drive test lasted 45 minutes though it was supposed to last only about 15 minutes.

Due to her nervousness, appellant's hands began to sweat during the test.  Appellant began to dry her sweaty hands against her pants.  Llamzon noticed this and told her to bring her hands to the air conditioner, but appellant did not want to move her hands away from the steering wheel as she feared failing the test.  Llamzon then grabbed appellant's hand and brought it to his penis area.  He positioned her fingers in the area of his groin and did a slow wiping motion with her right hand.

Appellant did not know what to do because she feared if she opposed Llamzon she would fail the driving test.  She attempted to move her hand away from Llamzon, but he held on to it.  Eventually, she was able to free her hand from his.  At no time did she consent to touching Llamzon's penis or groin area, or for Llamzon to touch her hand.

Also during the driving test Llamzon made inappropriate and sexually suggestive comments to appellant, including:  "You need a real man in your life."  "Do you live alone?"  "Do you know how to get to the White Globe[?]"  (Appellant understood the White Globe to be a place where couples go.)  "I did not realize how pretty you were."  "Do you want to know anything about me?"  "Do you have a boyfriend[?]"  "Maybe I can come visit you sometime like at work or at your house."  (Llamzon made this comment while verifying appellant's home address, as he already had her home address information.)  "I really want to keep driving with you."  "I really do not want the car ride to end."  "Maybe I come to Lucille [*sic*] at your work and you can take care of me."  (Appellant had her name tag from Lucille's restaurant,

where she worked, in her car, and Llamzon asked appellant if she worked at Lucille's.)  "I only pass people who I feel deserve it."

During the drive test Llamzon stared at appellant, which made her uncomfortable.  She found his stares to be harassing and intimidating.  When she put the car in reverse and moved her head to look out the back window of the car, Llamzon's face was uncomfortably close to hers.  When she told him that she could not focus with him staring at her, Llamzon replied, "Should I put my glasses on so you can't see my face?"

At the end of the driving test they returned to the DMV office where Llamzon told appellant not to repeat anything they had talked about during the drive test.  He said this just before he handed appellant the paper showing that she passed the test.  Llamzon then stated that "maybe" he could come visit her at her work or her house and repeated appellant's home address back to her.  Appellant was offended by Llamzon's comments.

As Llamzon walked away, he ripped the paper license plate off of appellant's front license plate holder without her permission.  He then walked to another car.  Afterward, appellant told the friends who had accompanied her to the test that Llamzon was a pervert and explained to them what happened.

Appellant also informed her stepfather about what had happened to her during her driving test.  Appellant's stepfather reported the incident the following day to the DMV office manager, Judy Hollinger, who immediately reported it to upper management.  Appellant's stepfather also reported the incident to the Los Angeles Police Department and made a Facebook post about the incident, which "went viral."

**Events following the incident**

It was DMV policy that once a sexual battery allegation is made, the allegations must be investigated and the accused placed on administrative leave. The DMV, with approval from its director Jean Shiomoto and chief deputy director, William Davidson, placed Llamzon on administrative time off (ATO) beginning June 27, 2016. DMV had 30 days to decide whether to extend Llamzon's ATO or return him to work.

On July 23, 2016, Frank Alvarez, chief of investigations at DMV, sent an e-mail to regional administration of the DMV stating:

> "I am waiting for a response back from either [Davidson] or [Shiomoto]. The investigation resulted in at least 16 interviews of females [th]at the LRE tested and nothing as fruitful as expected. We will submit to DA. But more tha[n] likely, the case will be rejected. Our recommendation . . . was to bring back from ATO and place at counter until DA rejects."

In late July 2016, Shiomoto and Alvarez met to discuss whether to return Llamzon to work or to continue his ATO. They decided to put Llamzon to work at the counter.[3]

---

[3] On August 3, 2016, David Keenan, chief of the human resources branch, sent the following memorandum to the personnel services branch:

> "Mr. Llamzon allegedly engaged in unwanted sexual advances directed at a minor during a drive test at work and investigation was being conducted by the Investigation Division, Internal Affairs Unit (IAU). The Human Resources Branch (HRB) recently received information from the IAU that there is insufficient evidence at this time. As a result, Mr.

Llamzon returned to work at the San Pedro DMV on August 2, 2016, at which time he was assigned to work as a "tester," an employee who directs customers to a computer to take their written test. Llamzon's work included informing members of the public whether they passed or failed their written exam, and scheduling a retest for those who failed. If a person passed, he would schedule a drive test and print a permit. In this position, Llamzon would interact with between 50 and 100 customers per day.

Hollinger, the San Pedro DMV office manager, had supervisory responsibility over all employees. Hollinger testified that it was appropriate for Llamzon to be assigned to work at the counter as he could be closely monitored. He was in a controlled environment and closely observed by supervisors. During the time that Llamzon was on restricted duty, there were no complaints regarding Llamzon's conduct.

Although Llamzon returned to work on August 2, 2016, the DMV did not complete its investigation until September 22, 2016.

During the course of the investigation DMV investigators located four additional potential victims:

Daria Diachenko took a drive test with Llamzon on June 20, 2016. She reported that during the drive test Llamzon made conversation with her about her stay in the United States and commented about the jewelry she was wearing.

---

Llamzon was ordered to return to work, and he returned effective August 2, 2016. Therefore, the Department of Motor Vehicles (DMV) requests an ATO extension only to cover the six (6) additional days that Mr. Llamzon was off work."

6

G.M., a minor at the time of her test, took her driving test at the San Pedro DMV with Llamzon on March 11, 2016. Among other comments, Llamzon asked G.M. about her piercings. G.M. told Llamzon how many ear piercings she had, and Llamzon commented, "[O]h[,] that's how you like it!" G.M. felt that the comment was a reference to a sexual position and was an unwanted sexual advance on her. However, she wanted to focus on the exam so she did not address it further. In addition, Llamzon asked G.M. if she had ever been to Disneyland, adding, "I've never been to Disneyland, when you pass your exam you can drive me to Disneyland."

Veronica Lopez had a drive test with Llamzon on June 21, 2016. During the drive test Llamzon asked her personal questions. He inquired about her brother, "Is that guy your boyfriend?" When Lopez responded that it was her brother, Llamzon inquired, "[W]hy does he look Mexican and you look white?" Llamzon asked Lopez many questions about where she worked and what hours she worked. He then asked if he could go to her workplace. Lopez recalled that Llamzon was staring at her, and she asked, "What are you staring at?" Lopez reported that the drive test, which was a retest, took about 25 minutes longer than her first test.

E.L. (16 years of age) took her drive test with Llamzon on May 25, 2016. E.L. recalled Llamzon being friendly and talkative throughout the drive test. Llamzon made many jokes throughout the exam, including a joke involving Llamzon putting money into E.L.'s bank account if she passed the test.

On September 13, 2016, a customer complained that she did not want her daughter interacting with Llamzon at the counter.

7

On September 22, 2016, DMV completed its investigation report, finding:

"This investigation sustained allegations of sexual harassment.  Through the evidence gathered from the victim's statements and investigation search results; this investigation found Llamzon to have engaged in unprofessional conduct to include a violation of battery with victim V[.]  During her exam, Llamzon, against her will, grabbed her right hand with his left hand and rubbed her right hand along his left inner thigh, violating California Penal Code 243.4(a); Sexual Battery, a misdemeanor.

"Victim [G.M.] reported she was a victim of harassment from Llamzon.  On March 11, 2016, Llamzon conducted a drive test for [G.M.], a minor at the time of the exam.  During the drive test Llamzon made sexually inappropriate comments to victim [G.M.] making her feel uncomfortable; violating California Penal Code 647.6(a)(1) Children; annoy or molest, a misdemeanor.  [¶]  . . .  [¶]

"This report is being prepared for the County of Los Angeles District Attorney's Office for criminal filing consideration.  The report will also be submitted to the DMV Field Operations Division for administrative review and disposition."  (Some capitalization omitted.)

Following submission of the investigation report, it is reviewed by appropriate individuals within the field operations division for a determination whether to take adverse action against the employee.  An additional process must follow, including preparation of documents to be served on the employee, and service on the employee.  Once the employee is served with notice of the adverse action, DMV generally places the employee

8

on ATO until the termination becomes effective. The employee is permitted "*Skelly* rights" and may file for a *Skelly* hearing, where an independent individual reviews the adverse action and makes a recommendation whether or not to uphold or modify the action.[4]

Llamzon was placed on ATO a second time on February 23, 2017, until his termination from employment on March 7, 2017.

Human resource chief Keenan testified that the DMV "did what it was supposed to do. It mitigated the immediate circumstances, [to] prevent the conduct from occurring again, sequestered him in the office, conducted an investigation, prepared an adverse action, served him and terminated him."

## PROCEDURAL HISTORY

Appellant filed her complaint against DMV and "Manny Roe" on June 28, 2017.[5] The complaint alleged five causes of action: (1) sexual battery, (2) liability under Civil Code sections 51.7 and 52.3, (3) liability under Civil Code sections 51.9 and 52, (4) battery, and (5) negligence.[6]

On September 21, 2018, DMV filed a motion for summary judgment. Appellant opposed the motion.

---

[4] Civil service employees have a property interest in the continuation of their employment, which is protected by due process. (*Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, 206 (*Skelly*).)

[5] On November 27, 2017, appellant identified "Manny Roe" as Llamzon. Llamzon is not a party to this appeal.

[6] On September 4, 2019, appellant dismissed without prejudice her fifth cause of action for negligence.

On September 13, 2019, the trial court entered its decision granting DMV's motion for summary judgment. The decision focused on the doctrine of respondeat superior, noting that Government Code section 815.2, subdivision (a), expressly makes the doctrine of respondeat superior applicable to public employers. (Citing *Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 932.) However, the court also noted that the doctrine applies only when the tort of an employee took place when the employee was "acting within the scope of his or her employment." (*Baptist v. Robinson* (2006) 143 Cal.App.4th 151, 160.) After considering the authorities and arguments of the parties, the court concluded that vicarious liability could not reasonably attach to create liability on the part of DMV in this case.

The court also addressed the doctrine of ratification. It found that appellant could not satisfy any of the elements of ratification and that no reasonable juror could reach the conclusion that the DMV approved Llamzon's alleged sexual misconduct.

Appellant filed her notice of appeal on October 7, 2019.

## DISCUSSION

### I. Applicable law and standard of review

A motion for summary judgment is properly granted if the submitted papers demonstrate there is no triable issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant meets this burden by showing that one or more elements of the plaintiff's cause of action cannot be established. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 854.) A

10

defendant may also meet this burden by showing that there is a complete defense to the cause of action. (*Castellon v. U.S. Bancorp* (2013) 220 Cal.App.4th 994, 997.)

Once the defendant makes such a showing, the burden shifts to the plaintiff to set forth specific facts that a triable issue of material fact exists. (*Castellon v. U.S. Bancorp, supra*, 220 Cal.App.4th at p. 997.) In order for an issue to be considered material, it must "'relate to a claim or defense in issue which could make a difference in the outcome.'" (*Mallett v. Superior Court* (1992) 6 Cal.App.4th 1853, 1863-1864.)

We review a trial court's decision to grant summary judgment de novo. (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 805.) We accept as true the facts alleged by the party opposing the summary judgment motion and the reasonable inferences that can be drawn from them. (*Ibid.*) We will affirm a summary judgment if it is correct on any ground that the parties had an adequate opportunity to address at the trial court level, regardless of the court's stated rationale. (*Angelotti v. The Walt Disney Co.* (2011) 192 Cal.App.4th 1394, 1402.)

## II. Respondeat superior liability

Appellant first argues that the trial court erred in denying respondeat superior liability as a matter of law, contending that contrary to the trial court's holding, a reasonable jury could conclude that Llamzon acted within the scope of his authority. Appellant claims that all of the factors which should be taken into consideration when determining respondeat superior liability, support applicability of the doctrine in this matter.

## A.    *Public entity liability*

The Government Claims Act (Gov. Code, § 810 et seq.) was enacted in order to restrict the grounds for public entity liability to "'"'rigidly delineated circumstances.'"'" (*Richards v. Department of Alcoholic Beverage Control* (2006) 139 Cal.App.4th 304, 317.)  Thus, except as provided by statute, "a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." (Gov. Code, § 815, subd. (a).)

Government Code section 815.2, subdivision (a) permits public entity liability under the doctrine of respondeat superior. The provision provides, "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." (Gov. Code, § 815.2, subd. (a).)  Thus, the statute does not permit liability if the acts of the public employee fall outside the scope of his or her employment.

## B.    *The doctrine of respondeat superior*

"Under the doctrine of respondeat superior, an employer may be held vicariously liable for torts committed by an employee within the scope of employment." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 208 (*Mary M.*).)  "[A]n employee's tortious act may be within the scope of employment even if it contravenes an express company rule and confers no benefit to the employer." (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1004 (*Farmers*).)  An employee's willful or malicious intentional torts, "including those that might contravene an employer's express policies, do not automatically fall outside the

12

scope of employment." (*Daza v. Los Angeles Community College Dist.* (2016) 247 Cal.App.4th 260, 268 (*Daza*).)  However, to fall within the scope of employment, "the intentional misconduct must be 'an "outgrowth" of the employment' and the risk of tortious injury must be ""inherent in the working environment"" or ""typical of or broadly incidental to the enterprise [the employer] has undertaken.""" (*Ibid.*)  Similarly, the intentional conduct must be "foreseeable" from the employee's duties, meaning that it was ""not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.""" (*Ibid.*)

"Sexual assaults are not per se beyond the scope of employment." (*Daza, supra*, 247 Cal.App.4th at p. 268.)  However, courts rarely have found an employee's sexual assault or sexual harassment of a third party falls within the scope of employment. (*Ibid.*)  In fact, the only California case in which an employee's sexual assault of a third party was held to be within the scope of employment was *Mary M., supra*, 54 Cal.3d at page 202.  In *Mary M.,* a Los Angeles Police Department sergeant stopped the victim for erratic driving.  The officer was in uniform, wore a badge and a gun, and was driving a marked black and white police vehicle.  After the officer asked the victim to perform a field sobriety test, she began to cry, and pleaded with the officer not to take her to jail.  The officer told the victim to get in the front seat of his police vehicle.  He did not handcuff her.  He drove her to her home and then demanded "'payment'" for taking her home instead of to jail.  Although the victim tried to run away, the officer raped her. (*Id.* at p. 207.)

In *Mary M.*, the imposition of vicarious liability on the city was "based on 'the unique position of police officers with their

13

ability to arrest and use deadly force,' coupled with their "'substantial degree of authority'" and the use of that authority over the motorist plaintiff." (*Daza, supra,* 247 Cal.App.4th at p. 269.) "'Employees who do not have this authority and who commit sexual assaults may be acting outside the scope of their employment as a matter of law.'" (*M.P. v. City of Sacramento* (2009) 177 Cal.App.4th 121, 131 (*M.P.*).)

### C.    *Application of the doctrine in this case*

The controlling authority dictates that DMV is not responsible for Llamzon's sexual conduct under the doctrine of respondeat superior in the circumstances before us.  The only California case in which an employee's sexual assault was held to have fallen within the scope of employment was *Mary M., supra*, 54 Cal.3d at page 202, which has been expressly limited by courts considering the vicarious liability of employers for sexual misconduct.

In *M.P., supra*, 177 Cal.App.4th 121, a woman alleged that while working as a photographer at an evening event, she came across a crew of firefighters who had driven in their fire truck to the event.  (*Id.* at p. 125.)  One of the firefighters invited her to take photographs of him and another firefighter on the fire truck. One of the firefighters was off duty, and one was on duty.  The photographer was sexually assaulted by the firefighters on the fire truck.  (*Ibid.*)  While acknowledging the *Mary M.* decision, the *M.P.* court declined to extend its holding to the circumstances present in the *M.P.* case.  The court stated, "both the *Mary M.* decision itself, and subsequent decisions by the California Supreme Court, dictate we not extend vicarious liability to the alleged sexual assaults by the firefighters in this case."  (*M.P.*, at p. 131.)  The *M.P.* court noted that the *Mary M.* majority stressed

14

that its decision flowed from "'the unique authority vested in police officers.'" (*M.P.*, at p. 131.) In addition, the Supreme Court later observed that our state's courts had not extended the *Mary M.* holding to employees other than police officers. (*M.P.*, at p. 131, quoting *Farmers, supra*, 11 Cal.4th at pp. 1006-1007 ["'except where sexual misconduct by on-duty police officers against members of the public is involved [citations], the employer is not vicariously liable to the third party for such misconduct [citations]'"].)

Other cases cited by the parties in which the perpetrator was in a greater position of trust than Llamzon, have held that sexual assault or harassment was not within the scope of employment. A guidance counselor at the Los Angeles Community College District, who purportedly sexually assaulted a student when she went to his office for guidance, was not acting within the scope of his authority as a matter of law when he allegedly used his position of authority to sexually harass and molest the student. (*Daza, supra*, 247 Cal.App.4th at p. 269.) The *Daza* court concluded that, "[c]onsistent with the vast weight of authority," the student's allegations of sexual assault against the counselor fell outside the scope of his employment as a guidance counselor. (*Ibid.*) The court explained, "His alleged conduct was not an outgrowth of his employment, it was neither inherent in nor typical of the District's educational enterprise, and it was not foreseeable from Daza's duties as a guidance counselor." (*Ibid.*)

Similarly, an ultrasound imaging technician was not acting within the scope of his authority when he sexually molested a patient under the pretense of conducting an ultrasound imaging examination. (*Lisa M. v. Henry Mayo Newhall Memorial*

15

*Hospital* (1995) 12 Cal.4th 291, 303-304 (*Lisa M.*).) The *Lisa M.* court concluded that the assault was the "independent product" of the technician's "aberrant decision to engage in conduct unrelated to his duties." (*Id.* at p. 303.) Thus, although they arose in the context of a physical examination, the technician's actions "were not foreseeable from the nature of the work he was employed to perform." (*Ibid.*) Further, unlike the officer in *Mary M.*, the technician did not have "any power to exercise general control over plaintiff's liberty." (*Lisa M.*, at p. 304.) Thus, the hospital was not liable under the doctrine of respondeat superior as a matter of law. (*Id.* at p. 306.)[7] Other examples of cases in which employers were not liable under the doctrine of respondeat superior as a matter of law include *Farmers, supra,* 11 Cal.4th at page 997 [deputy sheriff's sexual harassment of other deputy sheriffs working at county jail not within scope of employment]; *John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438, 441, 447-452 (*John R.*) (teacher's sexual molestation of student at teacher's apartment during sanctioned extracurricular program not within scope of employment); *Z.V. v.*

_____

[7] Appellant points out that in *Lisa M.,* the sexual battery occurred after the performance of the sanctioned ultrasound. (*Lisa M., supra*, 12 Cal.4th at p. 301.) Thus appellant argues, it was not directly connected to the technician's job duties. Appellant contends that the facts before us are different, because the alleged acts occurred during a sanctioned driving test. This minor factual distinction does not permit appellant's action to proceed on a respondeat superior theory, particularly in light of the substantial authority holding otherwise. The nature of the employee's acts, and the nature of his employment, are far more significant in determining whether or not the employee's tortious acts fall within the scope of his employment.

16

*County of Riverside* (2015) 238 Cal.App.4th 889, 891, 896-897 (*Z.V.*) (social worker's sexual assault of minor outside of work hours and at social worker's apartment not within scope of employment); and *Alma M. v. Oakland Unified School Dist.* (1981) 123 Cal.App.3d 133, 139-140 (*Alma W.*) (school janitor's rape of student in janitor's office not within scope of employment).

This substantial case authority leaves no room for a different decision in this case. Llamzon had significantly less contact and control over appellant than the guidance counselor in *Daza*, the teacher in *John R.*, and the social worker in *Z.V.*

In addition, Llamzon cannot be described as having similar authority to that vested in police officers. As the *Mary M.* court emphasized, "[p]olice officers occupy a unique position of trust in our society. They are responsible for enforcing the law and protecting society from criminal acts. They are given the authority to detain and to arrest and, when necessary, to use deadly force. As visible symbols of that formidable power, an officer is furnished a distinctively marked car, a uniform, a badge, and a gun. Those who challenge an officer's actions do so at their peril; anyone who resists an officer's proper exercise of authority or who obstructs the performance of an officer's duties is subject to criminal prosecution." (*Mary M., supra*, 54 Cal.3d at p. 206.) In contrast, an LRE such as Llamzon conducts driving tests. They use standardized evaluations and while they are vested with the authority to determine whether an individual has passed the test, they have no authority to detain, arrest, or use deadly force against an individual.

Under the applicable legal precedent DMV is not liable for Llamzon's sexual misconduct as a matter of law.

17

**D.** *The policy goals of the respondeat superior doctrine*

Appellant argues that the trial court erred in failing to analyze the three policy goals of the doctrine of respondeat superior. Appellant points out that the *Mary M.* court identified three policy considerations in making its decision to impose respondeat superior liability in that case. Those considerations were (1) the prevention of recurrence, (2) greater assurance of compensation to the victim, and (3) the appropriateness of spreading the risk of loss among the beneficiaries of the enterprise. (*Mary M., supra*, 54 Cal.3d at pp. 209, 214-217.)

First, we note that the trial court was not required to analyze these policy considerations in detail in the context of this case. The substantial authority holding that employers are not liable for sexual misconduct under the doctrine of respondeat superior—with only one, very limited exception—left no room for the trial court to decide otherwise in this case. The trial court properly analyzed the applicable case law and determined that the cases more analogous to the facts here held that sexual misconduct falls outside the scope of employment as a matter of law.

Further, we disagree that the three policy considerations support imposition of respondeat superior liability in this case. In support of her argument that the imposition of liability would prevent recurrence, appellant asserts that DMV in this case "empirically failed to prevent recurrence." Appellant states that Llamzon had at least four other drive test victims in addition to appellant. Appellant suggests that a feedback card or survey sent to each applicant following the drive test would lead to a greater identification of LRE's who engage in sexual misconduct.

18

The evidence filed in support of DMV's motion for summary judgment showed that DMV has protocols in place to prevent sexual misconduct on the part of its employees. Hollinger offered her comment that during the time she was office manager at the San Pedro DMV she made it clear to all employees, including Llamzon, that DMV employees are not to engage in sexual harassment, including sexual touching, and that she had a zero tolerance policy with regard to such action. In addition, all DMV employees including Llamzon, were required to undergo sexual harassment training on a regular basis. Llamzon completed this training. Allocating additional responsibility for the sexual misconduct of LRE's would create logistical difficulties for DMV. Due to the nature of driving tests, it is difficult to eliminate the one-on-one situation without significant financial burden. Nor would it serve the public interest to eliminate on the road driving tests. As to appellant's suggestion of a brief survey, we note that the other purported victims in this case did not report problems after their drive tests. Instead, they responded to an investigation after appellant's allegations against Llamzon had already gone "viral." Thus, it does not seem likely they would have otherwise complained. In fact, Hollinger noted that she occasionally receives feedback from customers and had only received generally positive customer comments and feedback about Llamzon.

Also, according to Alvarez the chief of investigations, there were only a "handful" of sexual misconduct cases involving LRE's dating back as far as he could recall, even before the time that he became chief of investigations. Chief deputy director Davidson also had heard of only "[m]aybe three" other such cases occurring during his time at the DMV. Thus, DMV's efforts to train its

19

personnel and make known its zero tolerance policy appears to be sufficient.

In contrast to appellant's argument, the limited number of incidents of sexual harassment over the years by LRE's, in proportion to the number of drive tests conducted during the same time frame, do not render Llamzon's actions a "foreseeable" consequence of the activity of supervising a driving exam. (*Lisa M., supra*, 12 Cal.4th at p. 299, citing *John R., supra*, 48 Cal.3d 438, 450, fn. 9, & *Alma W., supra*, 123 Cal.App.3d at pp. 141-142.) Appellant asks that we focus on the "so divorced" from work standard set forth in *Mary M.* to find that Llamzon's conduct was foreseeable in this matter. (*Mary M., supra,* 54 Cal.3d at p. 214.) The *Mary M.* court "asked itself whether the sexual assault there was '*so* divorced' or '*so* unusual' . . . from the employee's employment that it exceeded the employee's 'scope of employment.' [Citation.] Thus, *Mary M.* recognized that while sexual assault is an extraordinary, abnormal event in any workplace context, the focus would be on the extent of abnormality." (*Z.V., supra*, 238 Cal.App.4th at p. 898, quoting *Mary M.*, at p. 214.) Here, the numbers show that Llamzon's acts were abnormal considering the limited number of incidents over the years. In addition, Llamzon did not have the same degree of power over appellant as did the officer in *Mary M.* over his victim. The case law uniformly holds that for public employees wielding less power than police officers, sexual assault is so divorced from the employee's employment as to be outside the scope of employment as a matter of law.

We reject appellant's suggestion that DMV's actions following the incident did not sufficiently prevent recurrence. After becoming aware of appellant's allegations against Llamzon,

20

DMV immediately put him on leave. DMV was required to balance the concerns regarding appellant's allegations with Llamzon's due process rights. Thus, DMV returned Llamzon to work in a supervised counter position until his termination. There is no evidence suggesting that DMV's postallegation actions caused harm or facilitated recurrence of sexual misconduct.

As to the second policy goal of assuring compensation to the victim, appellant notes that Llamzon did not have enough money to pay his attorneys to be present for his deposition, much less pay a judgment. Thus, there is no assurance to appellant that she will receive anything if she prevails in her lawsuit against Llamzon, the only remaining defendant. However, in addressing this policy goal, the *Mary M.* court noted that numerous California decisions have "recognized, at least implicitly, that vicarious liability is an appropriate method to ensure that victims of police misconduct are compensated." (*Mary M., supra*, 54 Cal.3d at p. 216.) The only distinction in *Mary M.* was that the victim was raped, rather than beaten, by an officer. (*Ibid.*) The *Mary M.* court opined that "the victim's need for compensation in this instance is as great as in other cases of violent tortious conduct by a police officer while on duty." (*Ibid.*) Appellant has presented no such precedent showing a collective recognition of the need for compensation under the present circumstances. Thus, the second policy goal is not met here.

The third policy consideration is the appropriateness of spreading the risk of loss among the various beneficiaries of the enterprise. In *Mary M.,* the court pointed out that "society has granted police officers extraordinary power and authority over its citizenry." (*Mary M., supra*, 54 Cal.3d at p. 216.) This includes

21

"'the most awesome and dangerous power that a democratic state possesses with respect to its residents—the power to use lawful force to arrest and detain them.'" (*Ibid.*) Under those specific circumstances, "The cost resulting from misuse of that power should be borne by the community, because of the substantial benefits that the community derives from the lawful exercise of police power." (*Id.* at p. 217.)

While LRE's such as Llamzon certainly provide a benefit to our society in ensuring the skill of those who have a driver's license, they are not entrusted with nearly the same "formidable" level of power as police officers. (*Mary M., supra*, 54 Cal.3d at p. 217.) Nor is there the same "inherent" potential for abuse. (*Ibid.*) LRE's do not carry guns and do not have the authority to use force or arrest citizens. They have only the authority to determine if an examinee has passed a standardized driving test. If the examinee does not pass the test the consequences are not dire—the examinee may simply take the driving test again in the near future.

In short, the policy considerations favoring imposition of respondeat superior liability in *Mary M.* do not exist in this case.

## III. Ratification

Appellant further argues that the trial court erred by denying appellant's ratification theory of liability.

### A. *Applicable law*

"An employer may be liable for an employee's willful and malicious actions under principles of ratification. [Citation.] An employee's actions may be ratified after the fact by the employer's voluntary election to adopt the employee's conduct by, in essence, treating the conduct as its own." (*Delfino v. Agilent Technologies, Inc.* (2006) 145 Cal.App.4th 790, 810, fn. omitted.)

"'A purported agent's act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is "inconsistent with any reasonable intention on his part, other than that he intended approving and adopting it."'" (*Dickinson v. Cosby* (2019) 37 Cal.App.5th 1138, 1158.)

Ratification is an alternate theory to respondeat superior. (*Baptist v. Robinson* (2006) 143 Cal.App.4th 151, 169 (*Baptist*).) "The failure to discharge an employee who has committed misconduct may be evidence of ratification." (*Ibid.*) The theory is generally applied "where an employer fails to investigate or respond to charges that an employee committed an intentional tort, such as assault or battery." (*Ibid.*)

An employer's ratification of an employee's conduct is generally a factual question. (*Baptist, supra,* 143 Cal.App.4th at p. 170.) However, summary judgment is appropriate where the theory of ratification is inapplicable as a matter of law. (See, e.g., *ibid.* [tortfeasor's personal activities did not constitute a form of misconduct that was later ratified by his employer]; *Fretland v. County of Humboldt* (1999) 69 Cal.App.4th 1478, 1491 [uncontradicted testimony of steps taken by employer regarding investigation and discipline sufficient to uphold summary judgment of ratification theory].)

### B. *Application to this case*

Appellant argues that DMV ratified Llamzon's misconduct by returning him to work on August 2, 2016, after an approximately 36-day ATO. Appellant argues that DMV returned Llamzon to work in spite of finding additional victims on July 13 and 14, 2016. A second act of ratification, according to

23

appellant, was when the DMV allowed Llamzon to continue working after September 22, 2016, the date on which DMV finalized its investigation into the incident reported by appellant. The investigation concluded that Llamzon did sexually harass appellant and G.M. In spite of this conclusion appellant argues DMV continued to allow Llamzon to work with the public.

After the DMV investigative report was prepared for the district attorney's consideration, on November 3, 2016, DMV sought to terminate Llamzon. However, Llamzon continued to work at the DMV, interacting with customers, full time, at his full rate of pay, through February 22, 2017.

Appellant argues that DMV's act of permitting Llamzon to continue working and reaping benefit from such work, constitutes sufficient evidence to support a ratification theory.

Appellant has produced insufficient evidence to support a ratification theory as a matter of law. Generally, to support a theory of ratification a plaintiff must show that the employer has failed to investigate or respond to charges that an employee committed an intentional tort. (*Baptist, supra*, 143 Cal.App.4th at p. 169.) Appellant can make no such showing in this matter. Upon hearing of the allegations against Llamzon, DMV immediately placed him on ATO and initiated an investigation. For civil service employees an initial ATO lasts only 30 days, at which time the employer must determine whether or not to seek approval of further leave. At the end of the 30-day period it did not appear there was enough information for a criminal prosecution against Llamzon. Thus, bringing Llamzon back from leave with restricted duties, not to include drive tests, was

appropriate for the time period during which the report was finalized.[8]

DMV's retention of Llamzon as an employee during the investigation did not equate to ratification, particularly in the context of the state civil service disciplinary system. A civil servant is entitled to due process prior to termination of employment. An investigative report is merely the opinion of the investigators. Once such a report is completed a request is sent to human resources, followed by a review by the DMV legal team and a review and approval by the division deputy director. After these procedures DMV prepares the adverse action documents for service upon the employee. In the matter at hand, DMV did exactly what it was supposed to do under the circumstances. It mitigated the potential harm to the public by sequestering Llamzon in the office, conducted an investigation, then served him, and terminated him.

DMV had constitutional and statutory obligations to protect Llamzon's property interest in his employment. (*Skelly, supra*, 15 Cal.3d at p. 206.) Appellant cites no authority suggesting that DMV's compliance with these obligations can be considered ratification. In fact, if a civil service employer

[8] As set forth above, during the time that Llamzon was placed on restricted duty, until the time of his termination, there were no complaints regarding Llamzon's conduct. Hollinger, who had years of experience with Llamzon, was comfortable with him working inside at the counter while the disciplinary process proceeded. Director Shiomoto, human resources chief Keenan, and regional administrator Velma Edmond also provided evidence that it was appropriate for Llamzon to work on limited duty as long as he was removed from drive tests and was closely monitored.

imposes discipline without providing these due process protections, the employer engages in a "'constitutional infirmity.'" (*Williams v. City of Los Angeles* (1990) 220 Cal.App.3d 1212, 1216.)

Since DMV immediately placed Llamzon on ATO and initiated an investigation of appellant's allegations following appellant's complaint, DMV's compliance with the due process safeguards in place to protect Llamzon's property interest in his job, in addition to a reassignment to a desk position, did not constitute ratification as a matter of law.[9]

## DISPOSITION

The judgment is affirmed.  Respondent DMV is awarded its costs of appeal.


_____, J.
CHAVEZ

We concur:


_____, P. J.     _____, J.
LUI                                HOFFSTADT

---

[9]     Because we have determined that DMV did not ratify Llamzon's actions as a matter of law, we decline to address DMV's alternative grounds for rejecting ratification (1) that the facts providing the basis for ratification were not alleged in the complaint, (2) that appellant fails to allege a statutory basis for liability under a ratification theory, and (3) that DMV's act of returning Llamzon to limited counter work was immunized under Government Code sections 820.2 and 821.6.